Arthur O'Connell, Appellee, v. Chicago and North Western Railroad Company, Defendant.
Appeal of City of Chicago, Appellant.

Gen. No. 41,059.

Heard in the third division of this court for the first district at the December term, 1939. Opinion filed May 22, 1940. Rehearing denied June 14, 1940.

BARNET HODES, Corporation Counsel, for appellant; ALEXANDER J. RESA and L. LOUIS KARTON, Assistant Corporation Counsel, of counsel.

THOMAS M. MORRIS, of Chicago, for appellee.

MR. JUSTICE HEBEL delivered the opinion of the court.

This is an action at law brought by the plaintiff for damages for personal injuries sustained by him when an automobile in which he was a passenger collided with a trestle or girder which was part of the viaduct on North Clark Street over the tracks of the Chicago & North Western Railroad. The case was tried before the court and a jury, and the verdict of the jury found the defendant city of Chicago guilty and assessed plaintiff's damages at the sum of $27,500. Motions of the defendant for a directed verdict, for a new trial and in arrest of judgment were overruled. Before denying the motion for a new trial the court directed a remittitur of $7,500. Upon such remittitur the court en-

tered judgment for $20,000. From this judgment the city of Chicago appeals.

The second amended complaint, which is the complaint upon which the cause proceeded to trial, alleges in paragraph 4 that the defendant, city of Chicago, negligently and improperly permitted Clark street at a point where the C. & N. W. R. R. Co. tracks are laid, to become and remain in a dangerous and unsafe condition in that a certain trestle had been placed and permitted to be in a dangerous and unsafe condition in the portion of Clark street used by vehicles; and alleges in paragraph 5 that the city permitted the street to be in an unsafe condition in that the said trestle was permitted to remain without barricades, lights or warning devices.

Prior to the trial the Chicago & North Western Railroad Co. was dismissed by the plaintiff.

The answer of the city to this complaint denies these allegations.

From the facts that appear in evidence, Clark street extends north and south in the city of Chicago and crosses the Chicago river. Directly north of the bridge over the river is a steel girder 16 inches wide and approximately 4 feet high, which extends along the center of Clark street parallel with the curbing on each side. The southbound street car track on Clark street runs along this girder to the west, and the northbound street car track runs along it to the east. At the north end of the girder a concrete base extends approximately 5 feet. Kinzie street extends east and west and is the next intersecting street across Clark street north of the girder. The distance from the south curb-line of Kinzie street to the north end of the girder is 196 feet. The dimensions herein stated are taken from a plat, which was introduced in evidence and is a part of the record.

The girder was built by the Chicago and North Western Railroad Company over its tracks in Carroll street in 1910 or 1911, and blueprints produced at the trial

showing the details of its construction were taken from the records of the railway company.

At the northeast corner of Clark and Kinzie streets there is a light pole upon which there is a 600 candle power street lamp. At the southwest corner of Clark and Kinzie streets there is another electric light pole supporting a 600 candle power street lamp. On the east side of Clark street, 140 feet south of the south curb-line of Kinzie street, is another electric light pole upon which there is a 600 candle power street lamp. This lamp is approximately 56 feet north of the north end of the girder. 138 feet south of this point on the west side of Clark street there is another electric light pole upon which there is a 600 candle power street lamp. Directly south of the girder there are four 1,000 candle power lamps at the north end of the bridge. All these lights were burning at the time of the plaintiff's accident.

On Sunday evening, September 27, 1936, one Mrs. Grace McNamara McLaughlin, a married woman unaccompanied by her husband, called for the plaintiff at his hotel. From that place Mrs. McLaughlin took the plaintiff, as he says, to the home of her sister, where persons other than the plaintiff played cards. About midnight Mrs. McLaughlin took the plaintiff in her automobile to a place known as "Schulein's" at 1800 N. Halsted street, where they arrived shortly after midnight. Schulein's place is a tavern, where in addition to beer and liquor food is also served. The bar is in front of the place and the meals are served in the rear. The plaintiff and Mrs. McLaughlin were served with meals. They remained in the place until after three o'clock in the morning. The plaintiff insisted in his testimony that neither he nor Mrs. McLaughlin consumed any alcoholic beverages during the period of more than three hours that they were there, but Schulein himself, the proprietor, made it known that the plaintiff and Mrs. McLaughlin had had "a few beers,

maybe four or five." Schulein attempted to account for the length of their stay by saying that he was "showing them card tricks."

When the plaintiff and Mrs. McLaughlin left Schulein's they got into her car and travelled south on Halsted street to North avenue, east on North avenue to Clark street and then south on Clark street. Mrs. McLaughlin did the driving. The lights on the automobile were on and the plaintiff testified that it was possible to see 70 to 75 feet ahead of the car. The radio was turned on low and at the time of the accident plaintiff was leaning over to turn it on louder. As the plaintiff and Mrs. McLaughlin travelled south on Clark street her car straddled the east rail of the southbound car track. Mrs. McLaughlin was driving at the rate of from 30 to 35 miles per hour, and when she did not slacken her speed crossing Kinzie street, on which there is an east and west street car line, her manner of driving attracted the attention of a pedestrian standing at the northeast corner of Clark and Kinzie streets, who watched her as she sped up the incline because, as he said, he knew from the way she was driving that she was going to hit the girder. This pedestrian was called as a witness by the plaintiff and he further testified that at the inquest on the death of Mrs. McLaughlin he had testified that from where he stood on the northeast corner of Kinzie and Clark streets he could see the abutment or girder with which Mrs. McLaughlin's car collided. The police officer who was sent to the scene of the accident shortly after it occurred testified that he saw the girder from Kinzie street, and a driver of a Chicago Tribune truck testified that he passed the place frequently in the course of his work and that he was always able to see the girder from a distance at night. The street was dry. The collision of Mrs. McLaughlin's car with the girder caused her death and the injuries to the plaintiff for which he is prosecuting this action.

The plaintiff was taken to Henrotin Hospital on

September 28, 1936, and remained there until December 13th or 15th. From there he was taken to St. Joseph's Hospital in Joliet, where he remained until the latter part of February, 1937.

At Henrotin Hospital it was found that the tongue was torn from the roof of the mouth, the right ear was cut, and there were innumerable body bruises. X-rays were taken disclosing a spiral fracture at the junction of the middle and distal third of the right tibia, that is the small bone in the leg below the knee. The big bone was fractured an inch and a half from the lower end. The big bone was fractured three times, the small bone twice. The left leg had one small fracture at the tip of the big bone. About 400 stitches had been taken in plaintiff's face. There was no skull fracture, but he had suffered a concussion of the brain and was unconscious about 7 to 10 days.

Dr. Graham put a steel spike through the right heel and put on 20 or 25 pounds extension to prevent shortening. When the plaintiff left the hospital he had a cast and walking caliper, that is a steel extension so he could walk on it with the aid of crutches. In March, 1937, the cast was removed. Dr. Graham's bill was $450. Dr. Talbot's bill was for $400. After the cast was removed the plaintiff used crutches until June, and then used a cane. At the time of the trial he was still using an ankle brace, and complained of pain in his leg. The ankle swells when he stands on it for any length of time. His lower teeth were knocked out at the time of the accident. At the time of the trial the plaintiff stated that he had no sensation from the lower lip down to the chin, and could not taste. Dr. Joseph Talbot, the dentist, testified that all the teeth in the lower jaw had been broken off and knocked out, part of the lower mandible fractured, a majority of the upper teeth knocked out across the front, and the maxillary had been shattered. X-rays were taken, the remaining teeth or roots were gradually removed and partial den-

tures were made for him. Dr. Talbot stated that the lower mandible had been so badly injured that no denture could be fitted for him. He testified that a reasonable charge for his services would be $600 or $700.

On January 19, 1938, he was examined by Dr. Greenspahn who testified that he found a U-shaped scar on the upper lip, a three inch scar running across the chin, and a scar about 3 inches long running from the right ear downwards across the cheek. He found an irregularity along the shin of the right leg at the junction of its middle and lower third, and an irregularity of the outer knuckle of the ankle and a tightening or spasticity of the muscles around the instep and ankle. There was, he testified, a shrinkage of the muscles of the calf and the instep; a shortage of the right leg and a trifle less than one-half inch shorter than the opposite side. When he attempted to flex the ankle he found he could not increase the motions in dorsi-flexion beyond a right angle to the ankle. He stated that there was a permanent impairment of the circulation in the left leg at the lowermost portion of the internal malleolus of the shin bone. The charges from Henrotin Hospital were $597.50; nurses were paid $203, and $272.98 was charged by St. Joseph's Hospital.

The plaintiff calls this court's attention to the expenses that were incurred in the treatment of the injuries sustained by the plaintiff, as well as the loss of his earnings, as follows: Dr. Joseph Talbot, Dentist, $600; Dr. Edwin Talbot, Physician, $450; Dr. John A. Graham, Physician and Surgeon, $400; Henrotin Hospital, $597.50; St. Joseph's Hospital $272.98, Nurses, $203; 28 months' loss of work at $300 per month, $8,400, —total $10,922.

The city contends the record discloses that the bridge over the C. & N. W. R. R. tracks was constructed by the Chicago & North Western Railroad Company in 1910 or 1911. The trestle between the street car tracks was a part of the bridge construction. The existence of this

trestle is the basis for plaintiff's contention that the city was negligent in the maintenance of Clark street, and the defendant points out that the city's defense is that the bridge and trestle having been constructed by the railroad, and the city having no jurisdiction over the railroad it therefore cannot be held liable for any injuries resulting from their presence; and, that the exclusive jurisdiction over the railroad is now in the Illinois Commerce Commission, has been clearly expressed in a long line of cases, a few of which are cited. One case being *Stephens v. Chicago, B. & Q. R. Co.*, 303 Ill. 49, involving the jurisdiction of highway commissioners to compel a railroad company to remove posts supporting an overhead crossing from the center of a highway. The circuit court had ordered the railroad to remove the obstruction, and the Supreme Court referred to the amendment of section 58 of the Public Utilities Act in 1917 "to bring under the control of the Public Utilities Commission any railroad highway crossing, whether at grade, overhead or by subway." The Supreme Court upon the question involved said: "The legislature has the power to confer authority over the public highways throughout the State upon such local or State officers as it deems best and may divide the authority in such manner as it chooses. The authority over railroad crossings of highways, the place, manner, terms and conditions of such crossings, their construction, reconstruction, alteration or improvement and the apportionment of their cost, has been conferred upon the Public Utilities Commission. Such authority in its nature must be exclusive." And the cases of *Chicago B. & Q. R. R. Co. v. Cavanagh*, 278 Ill. 609; *City of Chicago v. Alton R. R. Co.*, 355 Ill. 65, are cited by the defendant in support of its theory that the city having no jurisdiction over the railroads it therefore cannot be held liable for any injuries resulting from their presence.

That is not the question involved in this action. The

question is: Did the city give a warning of the character of the construction by lights or printed notice of the location of this girder in the center of Clark street, which street was for the use of pedestrians, automobiles and other vehicles. It does not appear from anything in the record that when the accident occurred, which was at night, there was any light installed at the north, as well as at the south end of the girder which would warn a person operating an automobile that this girder was located in the center of Clark street.

While it is true, as we have indicated in the statement of facts in this case, there were certain electric lights located on Clark street, at the same time the defendant should have warned the drivers of automobiles of the location of the girder in question.

The plaintiff contends that it is the duty of the city to maintain its streets in a reasonably safe condition, and such duty is not questioned by the defendant. From the defendant's brief this language appears and is cited in support of the statement: "It is elementary that municipal liability for negligence is co-existent with the right to control. 'In order that a municipal corporation may be responsible for an injury resulting from the condition of a traveled way, it is necessary that such way be a public street or highway which the corporation is bound to maintain and repair; * * *' " 43 C. J. 981, Sec. 1764, 2, (1).

It does appear that the courts of this State have supported the rule just announced. In *City of Bloomington v. Bay*, 42 Ill. 503, the Supreme Court said:

"So in this case, if the sidewalk was originally built by the lot owner, the exclusive supervision being in the city authorities, they must see to the repairs and to its safety, . . ." And further, in the case of *City of Chicago v. Johnson*, 53 Ill. 91, the court said: "By the charter of the city of Chicago, which is a law of this State, the control of the public streets is given to the city, and the Board of Public Works of the city is

required to take special charge and superintendence over them, and the common council are authorized to cause the streets to be filled, graded and paved, and to keep them in repair." And it further appears from the language of the court in *City of Decatur v. Fisher,* 53 Ill. 407 that—"The authorities of a city, under whose control are its streets and sidewalks, have been held liable in damages for injuries received by reason of their being out of repair." To the same effect is the case of *City of Sterling v. Thomas,* 60 Ill. 264. See also *Wilmot v. City of Chicago,* 328 Ill. 552; *Farson v. Fogg,* 205 Ill. 326.

It does appear in the instant case that the trestle or abutment against which the plaintiff collided was a legalized obstruction. In other words, it was permitted by reason of the contract entered into with the defendant and the Chicago & North Western Railroad Company to construct the viaduct, so-called, of which this girder was a part. In the case of *City of Aurora v. Rockabrand,* 149 Ill. 399, upon the question of lighting the highway the court said:

"It will not do to say that an electric light upon a street, however bright, can always take the place of danger signals, where temporary obstructions are placed upon the street. The object of a danger signal is to direct the attention to a particular object, and warn those approaching, of something unusual. The electric light may enable those passing over the streets to see their way, and avoid others, and things generally found on the street, but they give no special warning whatever, and, as is well known from experience, are often deceptive and bewildering."

As in the case of *Wells v. Village of Kenilworth,* 228 Ill. App. 332, failure to so light or signal danger has been held to constitute at least prima facie evidence of negligence. Upon that question this court said:

"Principles underlying such a situation are that when a municipality places an obstruction in one of its

highways it is charged with the duty of properly guarding it and placing warning signals thereon so it will not constitute a danger to traffic, and it is a question for the jury whether or not this has been properly done. *City of Chicago v. Brophy,* 79 Ill. 277; *City of Salem v. Webster,* 192 Ill. 369; *Hanrahan v. City of Chicago,* 289 Ill. 400; *City of Aurora v. Rockabrand,* 149 Ill. 399; *City of LaSalle v. Evans,* 111 Ill. App. 69.''

From the record in the instant case, the nearest street light was 58 feet to the north and about 20 feet to the east of the obstruction, and it is suggested by the plaintiff that at least one witness stated that no light fell on the trestle. Another witness, speaking of lights, had this to say: ''Neither that night nor on any other occasion during the eight years prior to 1936 did I ever see light on that trestle nor any warning device of any kind.'' Specifications of the bridge, approved by the city 30 years ago, which are a part of the evidence, contain no provision for a light at this point in the construction. The trestle itself was a dirty, grayish black in color, blending in with the roadbed, and of course a jury was to pass upon the facts and whether from the evidence the condition was such that the city was guilty of failure to properly warn the plaintiff by a light at the north end of the girder. We all understand that the public had the right to the use of Clark street in going south or north, and it was the duty of the city to maintain the condition of the street so as not to cause injury by the driving of an automobile in approaching and going over this roadbed.

The defendant contends the evidence clearly shows that the only tortious cause of the plaintiff's injuries was the reckless driving of the woman in whose car he was riding, and there is evidence in the record that at the time the plaintiff was riding and approaching this intersection the car was being driven at a rate of speed of between 30 and 35 miles per hour, and that that rate of speed was more than sufficient to constitute prima facie evidence of negligent driving at the time and

place in question. Of course this question, under the instructions of the court that were given at the time, was a question for the jury, who passed upon it, and it does not appear from the rate of speed the car was being driven that it was such as to create in the mind of the plaintiff, who was a passenger, that the car was being operated at a reckless rate of speed, and it is suggested by the plaintiff that the driver of the car in which the plaintiff was a passenger was alone guilty, if any negligence was committed, and that the question was properly submitted to the jury, who answered it, and this negligence, if any, under the circumstances in the particular case was not imputed to the plaintiff.

The verdict and judgment is complained of by the defendant as being so grossly excessive that it cannot be cured by remittitur consented to by the plaintiff, and therefore that a new trial should have been granted. The verdict of the jury found the defendant guilty and assessed plaintiff's damages at $27,500. The defendant filed its motion for a new trial, urging among other things that the amount of damages awarded by the verdict and the judgment was excessive. The court after hearing arguments, stated:

''I think of course that the verdict in this case is entirely out of line; $27,500 is not justified. I think however that a substantial amount would be justified, and I think that amount, under all the circumstances, . . . a verdict of $15,000 would be a fair and just sum in this case. . . . Well, that is the conclusion I have arrived at Mr. Morris. Now, you can have a new trial. I would just as soon give you a new trial as not because there is plenty in this record that I do not like but I still feel that if you feel that way about it I will give you a new trial. . . . I will give you a new trial unless you are willing to remit down to $15,000.''

It is suggested by the defendant that the court was convinced that the verdict was excessive and that he was prepared to order a new trial, because, as he said, there is plenty in this record that he did not like, and cases

are cited in support of the defendant's contention. Subsequently however, the court made this statement:

"Well, I have the list of expenses that the plaintiff incurred here before me, as submitted by Mr. Morris, and have been thinking this matter over; and I believe that I was probably a little hasty—well, not hasty, but I may say arbitrary in reducing it to $15,000, and I think that $20,000 would not be out of line." and upon a remittitur having been entered with the consent of the plaintiff the verdict was reduced to $20,000 and judgment for that amount was entered.

It must be borne in mind that the court at no time after making the statement first above quoted, entered any order, and the court, upon further consideration, as we have indicated, was of the opinion that he was a little bit arbitrary in suggesting a reduction of the verdict to $15,000, and under the circumstances, as we view the record in this case, the defendant was not punished, as it states, by an increase from $15,000 to $20,000, for the reason that the court did not at any time enter an order, and after he suggested this amount he later changed it to the amount which he thought was proper, and we are of the opinion that the matter still being before the court, the court properly entered the amount that he believed was justifiable under the facts, and as he stated, in view of the expenses and losses that were sustained by the plaintiff, the amount that was finally entered was fully justified by the record.

And further, there does not seem to be any question offered that the giving of any of the instructions to the jury was objectionable, so that we have but the question as to whether the facts sustain the claim of the plaintiff, and as we have suggested, there is no error in this record, and accordingly the judgment is affirmed.

*Judgment affirmed.*

DENIS E. SULLIVAN, P. J., and BURKE, J., concur.