Robert H. Linneen, Administrator of Estate of Louise Linneen, Deceased, and Ignatius John Benson, Appellees, v. City of Chicago and The Sanitary District of Chicago, Appellants.

Gen. No. 41,269.

Opinion filed May 13, 1941.

BARNET HODES, Corporation Counsel, for certain appellant; J. HERZL SEGAL, ALEXANDER J. RESA and L. LOUIS KARTON, Assistant Corporation Counsel, of counsel.

ERNST BUEHLER, THOMAS F. DONOVAN and MEYER C. EDELMAN, all of Chicago, for certain other appellant; THOMAS F. DONOVAN and MEYER C. EDELMAN, of counsel.

FINN & MILLER, of Chicago, of appellees.

MR. PRESIDING JUSTICE FRIEND delivered the opinion of the court.

Robert H. Linneen, administrator of the estate of Louise Linneen, deceased, and Ignatius J. Benson, brought suit against the City of Chicago and the Sanitary District of Chicago, to recover damages against both defendants for the death of Louise Linneen and for injuries to Benson. Trial by jury resulted in verdicts against both defendants respectively; in favor of the administrator for $10,000 and in favor of Benson for $16,750. Motions for judgments *non obstante veredicto* and for a new trial were overruled and judgments entered on the verdicts. Defendants joined in an appeal, filing separate briefs.

The accident occurred at about 2:00 a. m. on October 26, 1934 at the juncture of the north approach of the bridge over the Sanitary District canal and Lincoln avenue, in the northwest section of Chicago. Robert H. Linneen, Louise Linneen, his wife, and Benson, were riding in a southeasterly direction along Lincoln avenue in a 1932 Chevrolet coupe belonging to Benson. All three were sitting in the front seat of the car, with Linneen at the wheel. They collided with the north-

west abutment of the bridge, and as the result of the collision Linneen's wife was killed and Benson was seriously injured.

Lincoln avenue has long been a public street within the city limits. It was a street long before the building of the Sanitary District canal. When the canal was constructed the Sanitary District acquired property along both sides of the street, cut a channel through the street and built the bridge in question. For many years the roadway of both bridge and street were of the same width, approximately 23 feet. Prior to 1932 the city passed an ordinance for the widening of Lincoln avenue from Diversey avenue to the city limits, which embraced the bridge in question and Lincoln avenue for a considerable distance northwest of the bridge. The improvement, when completed, established a highway approximately 70 feet in width, and consisted of four lanes of traffic. The bridge, however, remained at its original width, so that through the years 1932, 1933 and 1934, the traffic on this 70-foot roadway converged into a bridge roadway of 23 feet within the short space of 60 feet. After the accident a new bridge was built to conform to the newly widened highway, but before this was done numerous accidents had occurred in precisely the same manner as the accident in question and evidence thereof was adduced upon the hearing over the objection of defendants.

On the northwesterly approach a sidewalk was constructed across the bridge which ran between two iron girders. One girder next to the roadway extended 3 feet above the level of the pavement and terminated at the end of the bridge. Northwest of the bridge and extending to within 300 feet thereof was a grass plot in the center of the highway providing a two-lane car roadway on both sides thereof between the grass plot and the curb. This grass plot ended about 300 feet northwest of the bridge and from there on to the bridge the entire roadway was paved. A black line

divided the two lanes of the southwestern part of the roadway to the southeast of the grass plot. As the pavement approached the bridge this black line led directly to the sidewalk girder alongside the roadway, and if followed would direct an automobile right onto the sidewalk and into the girder. There were no street lights northwest of the bridge, but beginning about 100 feet south of the southeast end thereof there were high street lights located on the edge of the curb where the highway again reached a width of 70 feet. The bridge was approximately 275 feet in length and the lights to the southeast furnished no illumination to the northwest approach to the bridge.

Aside from the legal aspects of the case affecting the liability of defendants, which are of paramount importance in this appeal, it is urged by both defendants that plaintiffs have not established by a preponderance of the evidence that they were in the exercise of ordinary care. Of the three persons involved in the accident, Robert H. Linneen, his deceased wife Louise, and Benson, one was killed and the evidence disclosed that the other two suffered from retrograde amnesia, so that there was not among them any witness as to what happened at the time in question. The only two eyewitnesses to the accident were passengers in an automobile coming from the opposite direction who saw Benson's car approaching while they were crossing the bridge and heard the crash after they had driven about 15 or 20 feet beyond the northwest end of the bridge. They both testified that Benson's car was traveling at a reasonable speed, with the headlights burning, and under proper control. The accident occurred on a dark night with a slight fog arising from the canal. The immediate vicinity of the approach to the bridge was dark and sparsely populated.

There is considerable conflict in the evidence as to the adequacy of existing warning signals at the approach to the bridge at the time of the accident. De-

fendants adduced evidence tending to prove that there was erected in the parkway northwest of the channel a standard State highway sign, 3½ feet square, which was placed in a diamond shape, containing 8 inch reflector buttons, spelling the word, "SLOW," and immediately below that word, painted in black lettering 5 inches high, the words, "NARROW BRIDGE"; also a Welsbach flasher signal located outside of the south sidewalk and about 25 feet northwest of the end of the bridge; that there was bolted to the top of the upturned girder at the northwest end of the bridge an oblong box, 6 by 12 inches in dimension, on which were attached reflector buttons covering an area of 8 by 4 inches, which depended for reflection upon the headlights of approaching automobiles; that there was also erected at the end of the girder, and about midway from the top to the bottom thereof, a circular "bull's eye" reflector signal; and that there were fences beginning at the northwest end of the bridge and extending on both sides in a northwesterly direction for a distance of about 75 feet, which were painted white, with black stripes about 12 inches apart, covering the surface.

Although there is substantial agreement as to the existence of the Welsbach flasher signal and the reflector buttons attached to the girder of the bridge, there was a marked disparity between the testimony of witnesses for the respective parties as to the distance from which these warnings were visible, varying from 75 feet to 1,200 feet. As to the other warning signals, the evidence is so conflicting as to cast grave doubt whether they were there at the time of the accident. Several of defendants' witnesses, employees of the sanitary district, when called to describe the State highway sign, admitted they had not been asked about it until a day or two before they testified, and some of them admitted that before taking the stand, which was almost five years after the accident, they had been

shown a photograph which tended to refresh their recollection of the sign. When this photograph was taken is not shown of record. Defendants failed to call any witnesses who were present after the occurrence on the night of the accident to testify to the existence of such a sign, although two officers appeared on the scene immediately after the collision. Plaintiffs insist that no such sign then existed, but if there was such a sign, plaintiffs' evidence tended to show that the parkway on which the sign was said to be erected was filled with weeds for several blocks north of the bridge. These weeds were from 6 to 8 feet high, and if the jury believed the testimony of plaintiffs' witnesses, it is extremely doubtful whether the sign could have been visible to a motorist driving along the road.

Defendants complain because the court permitted plaintiffs to adduce evidence of other collisions of automobiles with the northwest end of the bridge covering a period of more than two years. This testimony was first brought into the case by counsel for the Sanitary District in cross-examining Ernest A. Spiegel, called by plaintiffs. Counsel for plaintiffs examined the witness on direct, with respect to prior accidents, but objections of defendants had been sustained by the court. Spiegel operated a gas station southeast of the bridge for several years. He described the condition of the bridge and the reflectors on the girder and the location of the flicker light, and testified positively that the conditions remained the same from the year 1931, when the roadway was widened, until the time of the accident in the case at bar. The bridge was the same, the street was the same width, and the lights and reflectors were all the same from the time the road was widened until the time of the accident. On cross-examination defendants' counsel elicited from Spiegel that he had frequently walked across the bridge after midnight to call the police for someone who had hit the bridge, and that

on these missions he paid attention to the lights and reflectors and found them broken most of the time, because some car or other object had "smashed into those reflector lights on the beam." Defendants' counsel offered no objection to this testimony, nor was any motion made to strike it after it was given. Thereafter numerous witnesses were permitted to testify concerning accidents in prior years under conditions similar to those that existed at the time of the accident in question. Officer Leeson, who testified for defendants, said that during all the time that he was familiar with the place the conditions north of the bridge with respect to the girder and flicker lights were the same as they were on the night of the accident. The able judge who tried the case in a most careful and painstaking manner, prepared an opinion setting forth his reasons for overruling the motions made by defendants for judgment *non obstante veredicto,* for a new trial and in arrest of judgment, wherein, in addition to discussing at length the legal aspects of the case with respect to the liability of defendants, he called attention to the fact that defendants, although admitting such evidence to be proper, contended that it should never have gone any further than to reveal that there was an accident, and that the accident must have been under precisely the same conditions, and pointed out that he had watched the evidence closely to see that it stayed within the bounds prescribed by law. Although numerous witnesses who had collided with the abutment of the bridge and been injured were permitted to testify to these prior accidents, an examination of the record discloses that their testimony was kept within proper bounds and it is fairly clear that all these accidents occurred under precisely the same conditions as the collision in the case at bar. The law is well settled that evidence of prior accidents, occurring at the same place or with the same instrumentality, are admissible as tending to show that the common cause of

such accidents was a dangerous and unsafe condition, and the frequency of such accidents also tends to raise the presumption of knowledge on the part of the offending parties. (*City of Bloomington v. Legg,* 151 Ill. 9, 13; *City of Chicago v. Jarvis,* 226 Ill. 614, 617; *Wolczek v. Public Service Co.,* 342 Ill. 482, 500; *Wells v. Village of Kenilworth,* 228 Ill. App. 332; *Budek v. City of Chicago,* 279 Ill. App. 410, 422.) Defendants cite cases where judgments were reversed because of testimony of this character introduced by a plaintiff (*Moore v. Bloomington D. & C. R. Co.,* 295 Ill. 63, and cases cited therein), but an examination of these cases, and especially *Moore v. Bloomington D. & C. R. Co.,* discloses that the conditions which caused the danger were in nowise similar to the conditions which caused the accident in the case under consideration. The testimony regarding other accidents in the case at bar tends to show that the instrumentality or agency which caused the danger was in substantially the same condition when plaintiffs collided with the bridge, and was therefore admissible.

Defendants argue that it was incumbent upon plaintiff Benson, and upon Linneen, as administrator, to prove by a preponderance of the evidence that they were in the exercise of ordinary care and caution at and immediately before the time of the accident, not only for Benson's safety but also for the safety of Linneen's intestate. It must be conceded that before an injured party can recover he must prove by a preponderance of the evidence that he was observing due or ordinary care for his person or safety. The criticism leveled at plaintiffs is that neither of them was able to recall the events immediately preceding the collision, and it is argued that "retrograde amnesia" was used as an alibi by both Benson and Linneen. The record discloses that Benson suffered an extensive skull fracture and was unconscious from October 26 until November 18. Defendants' counsel say that Lin-

neen was not injured and did not receive any medical attention, but it is undisputed that after the accident he was taken to the hospital and was in an unconscious condition and so remained for a day and a half. Linneen did not start suit on account of his injuries, but when the physician who attended him undertook to describe Linneen's condition by saying that he had seen him at the hospital after the accident and found him unconscious, counsel for one of the defendants objected to the answer on the ground that "Mr. Linneen is not suing here." The medical evidence pertaining to retrograde amnesia was given by Dr. Martin Schupman, a reputable physician with a satisfactory background, who had been on the staff of Cook County Hospital for ten years and was a member of the staff of Alexian Brothers Hospital, the North Chicago Hospital, the Deaconess Hospital, and a member of the faculty of Loyola University. He described retrograde amnesia as a condition produced by injury which tends to destroy the memory of the injured person for events immediately preceding the injury; that due to the sudden shock of the cerebellum, the recordings on the brain cells which produce memory are destroyed, with the result that events for a certain time prior to the accident, called memory, are not recorded; and that in some cases this lack of memory may go back for a considerable period preceding the shock. No countervailing proof was offered by defendants.

Plaintiffs produced two witnesses to make a prima facie case, showing that Benson had been in the exercise of ordinary care and caution at and immediately before the time of the accident, and that Linneen had likewise been observing due and ordinary care for the safety of his intestate. Both of these witnesses saw Benson's car approaching at a reasonable rate of speed, with the headlights burning and the car under proper control, and there was no evidence adduced by defendants to rebut this presumption.

This evidence, together with the highly conflicting testimony as to the adequacy or inadequacy of warning signals on the approach to the bridge, and the evidence of five prior accidents at the same place under similar conditions within a period of two years, presented questions of fact to the jury from which it was justified in finding that the situation in which a 70-foot roadway suddenly converging into a 23-foot bridge, presented such a grave and extraordinary danger as to require the utmost vigilance on the part of those responsible for the protection of travel at that point, and that this danger was improperly and inadequately safeguarded by one or both of the defendants charged with the responsibility.

The city seeks to exculpate itself from liability by contending that it had no jurisdiction or control over Lincoln avenue within the boundaries of the Sanitary District right of way, since Lincoln avenue was a State aid highway exclusively under the jurisdiction and control of the State and therefore it owed no duty to travelers to maintain the highway in a reasonably safe condition. To support this contention it introduced in evidence an agreement dated February 25, 1935, between the State of Illinois, "acting through the Department of Public Works and Buildings," and the city, which provided in effect that the city would maintain for a period ending not later than June 30, 1935, in a manner satisfactory to the department, portions of certain streets being used as extensions or parts of State highways lying within the city limits. The maintenance provided for included necessary repairs, cleaning and snow removal, but made no mention of street lighting or safety devices. Under this contract the State agreed to pay the city the actual cost of maintenance which should not exceed a specified sum, and that "all materials in each part or detail of the work shall be subject at all times to inspection, and the Department reserves the right to reject any

such materials or work found to be unsatisfactory.''
Attached to the agreement was a list of the streets
covered, which includes ''U.S. 41,'' being the highway
in question. Although the contract was dated four
months after the accident the court received it in
evidence, on the assurance of a later showing that such
contracts had been made from year to year between
the State and the city covering Lincoln avenue. How-
ever, this proof was not adduced and for aught that
appears of record Lincoln avenue was not covered by
the agreement at the time of the accident.

The State Aid Road project was inaugurated in
Illinois by legislative enactment during the years suc-
ceeding 1913 and was designed to, encourage the con-
struction of hard surface or improved roads by county
and State. Before ruling on defendants' motions for
judgment *non obstante veredicto,* for a new trial and
in arrest of judgment, the trial judge made an ex-
tensive examination of those statutes covering roads
and bridges which might have a bearing on the ques-
tion involved, and in his written opinion he set forth
the pertinent provisions of the various enactments.
From the provisions thereof it appears that the State
road program had a twofold purpose: (1) to encourage
the construction of hard surface roads by the county
and State, and (2) to establish a State highway system
by the State. Paragraph (b), sec. 1, Art. I, ch. 121,
Ill. Rev. Stat. 1939 (1913 Act) [Jones Ill. Stats. Ann.
120.001], defines the term ''State Aid Roads'' to mean
''all roads or bridges constructed, repaired or im-
proved at the joint expense of the State and any
county or counties within the State,'' as thereinafter
specified. Section 9, Article IV, provides that public
highways may be laid out at the joint expense of the
State and county, the State contributing one half and
the county or counties the other one half. As amended
sec. 9 provides that in all cases where through traffic
upon a ''State Aid Road'' (one that is constructed at

the joint expense of county and State) runs through a city, the county may locate a route upon existing streets or upon a new street to be laid out through such municipality as an extension of such State aid road, so as to form a continuous route to serve the needs of through or State traffic, and it provides that by agreement between the Department of Public Works and Buildings, with the city, Sanitary District or other municipal corporation, the improvement may be of greater width or of different type than that determined upon by the department; and that in such cases the excess cost of such improvements shall be paid by the municipal corporation, which shall thereafter maintain that portion of the improvement constructed and paid for by it and the remaining portion shall be maintained by the State or county.

In the second group, which was designed to encourage the construction of hard surface roads by the State (par. 292, sec. 2, subpars. (1) and (2),), the statute provides that the system of State highways shall comprise all State aid roads as defined in par. (b), sec. 1 of Art. I, of the 1913 Act, and all highways designated under Article IV, which may be laid out, improved or constructed at the joint expense of the State and any county therein, or by any county of the State. Paragraph 296a, sec. 6a, provides that in all cases where State or through traffic upon a State highway runs through a city, the Department of Public Works and Buildings shall locate a route upon existing streets to be laid out through such municipality as an extension of such State highway, so as to form a continuous route. Paragraph 296b, sec. 6b, provides that when such a State highway extension has been designated it becomes the duty of the department to supervise the construction or reconstruction performed on such streets or thoroughfares by the municipality with funds received from the State, and that "the Department shall maintain all streets designated as State

highway extensions.'' Paragraph 296c, sec. 6c, provides that by agreement between the department and the city, the construction may be of greater width than that determined by the department, and in such cases the excess cost is to be paid by the municipal corporation. Paragraph 296d provides that the department is authorized to enter into contracts with the city, terminable in the discretion of the department, under which the city shall maintain the improvement or portion under the control of the State located within the municipality, such maintenance to be under the supervision of the department and at the expense of the State. Paragraph 297, sec. 7, provides that when the highways designated shall be taken over from the several cities, the department shall notify, in writing, the commissioner of highways of the town or road district, the county superintendent of highways, or the mayor of the city of its intention so to do, and specify the date when it will assume the maintenance and care thereof. Paragraph 294 provides that when any road in the system is taken over the Department of Public Works shall file in its office a map of the State highways described, and that a copy of this map is to be filed in the office of the county clerk of each county.

Undoubtedly the city's position is predicated upon the contention that this was an *extension* of a State road which is defined by statute as one ''constructed, repaired or improved at the joint expense of the State and any county.'' However, there is no proof of record that Lincoln avenue comes within the statutory definition, or that it was constructed or improved at the joint expense of the county and State. From the provisions of Art. IV, sec. 9, and pars. 296 (a), (b) and (c), it is clear that the State should build all or a part of highways known as State aid extensions, and that municipalities, if they build any portion thereof, should maintain those portions. It would fol-

low from this conclusion that the record lacks adequate proof that Lincoln avenue was a State aid extension, nor is there any evidence that a map was filed in the Department of Public Works and a copy thereof with the county clerk, as is required by paragraph 294 with respect to State aid extension projects.

In the recent case of *Tapscott v. City of Chicago*, 301 Ill. App. 322, decided in 1939, the Appellate Court had occasion to discuss the question under consideration. The administratrix there had sought to recover damages for the death of her intestate, resulting from injuries received in an accident while a passenger in an automobile proceeding north on Halsted street in Chicago. The action was founded on the failure of the city to keep the street in repair. It was the contention of the city that Halsted street, at the site of the accident, was a State highway under control of the State, and that the city was therefore not liable for injuries occurring through any neglect in its upkeep. The court pointed out that there was no formal proof that Halsted street was a State highway, but only the unsupported statement of an assistant engineer in the highway department. On the contrary, it was shown that the street at this point was paved and used by general traffic and street cars, patrolled by city police officers, and that it had the customary green and red stop lights. This was held to be prima facie evidence that it was a city street. The theory of the case presented to the jury assumed it to be a city street under defendant's control. However, a contract between the State and the city was introduced in evidence, in which the latter agreed to maintain certain streets, including "all necessary repairs," and the court held that the defendant was liable for its negligence in failing to keep the street in repair, citing *Hanrahan v. City of Chicago*, 289 Ill. 400; *Schmidt v. City of Chicago*, 284 Ill. App. 570; *Village of Palestine v. Siler*, 225 Ill. 630; *People v. Willison*, 237 Ill. 584.

The cases cited in the *Tapscott* opinion are generally to the effect that where a municipal corporation is acting in a ministerial capacity in the discharge of its duty to repair streets, or remove obstructions from streets, or to keep streets in a safe condition for travel, it becomes liable for injuries caused by such negligence, and the court in the *Tapscott* case evidently considered that the contract imposed upon the city a ministerial duty comparable to its charter duty to keep the street in reasonably safe repair.

In another decision, *Live Stock National Bank of Chicago v. Richardson*, 303 Ill. App. 445, oral evidence was adduced to the effect that the highway there involved was a State aid road, and the question was presented whether it was controlled by the State. The opinion calls attention to the fact that 87th street, where the accident occurred, was within the city limits; that street and flicker lights were maintained by the city; that the city police patrolled 87th street at the scene of the accident, and were required to report any "outages" of the flicker lights to the city's police station or to the company which maintained them, and the tracks of the Chicago Surface Lines were maintained in the parkway under the supervision and control of the city. Two witnesses had testified that it was a State aid road, but the court held that in the absence of any official record tending to show that the management, control and care of the street had been ceded to the State, as contended, the city was charged with the maintenance and control of the street and was therefore liable.

The contract upon which the city relies in the case at bar was made four months after the accident, and there is nothing to indicate that it was in effect when these plaintiffs collided with the bridge. Although the State could, as the paramount authority, divest the city from control of the street and resume jurisdiction over it, there is no evidence to indicate that it had done so.

The city and the sanitary district are in disagreement as to the ownership of the property at the place where the accident occurred, including the part of the highway occupied by the bridge, the city contending that Lincoln avenue and the bridge within the boundary lines of the sanitary district property was owned and controlled by the sanitary district until September 14, 1934, the date when the Board of Commissioners of Cook county accepted the transfer of the bridge and the right of way through the sanitary district property. It seems to us, however, that the liability of the city does not depend upon who owned the property bordering on the highway, nor who constructed the bridge, since the approaches and the bridge were part of the public highway which the city for years before this accident had invited the public to use. It is the duty of a municipality to exercise ordinary care to keep the public highway reasonably safe, including that part of the highway, if any, which has been constructed by a third party, provided that by invitation and consent of the city it is used for public travel. (*O'Connell v. Chicago & N. W. R. Co.*, 305 Ill. App. 430; *Hogan v. City of Chicago*, 168 Ill. 551, 558, 559, and cases cited therein; *Town of Normal v. Bright*, 223 Ill. 99.) The city is in the position of having by ordinance compelled the widening of the public highway, without making any provision for the construction of the bridge of equal width, thereby creating an obstruction in the highway due to the use of a narrow bridge. This obstruction could probably have been made safe by narrowing the roadway so gradually that motorists would not be taken by surprise. Under some sort of agreement between the parties, which was not introduced in evidence, the sanitary district, in lieu of paying special assessments on its frontage as other property owners were required to do, was permitted to pave the highway itself past the line of the sanitary district's abutting property and including the pave-

ment on the bridge, as well as the construction of the approaches. This was done by the sanitary district by contract. However, the fact that the abutment or girder which constituted the obstruction and approaches thereto were constructed by the sanitary district, was immaterial so far as the liability of the city is concerned, because the city, having co-operated in the creation of a condition which necessarily caused a dangerous obstruction in the highway, was not released from its duty to exercise ordinary care to keep the public highway reasonably safe for travel thereon. Permitting this wide, well-paved highway to remain open to travel was a constant invitation to the public to use it. The city had the power to close the highway until a new bridge was constructed, or until the dangerous condition of the approach was remedied, but having left the highway open for public travel at night it became the city's duty to warn the traveling public of the danger, and this could only be done by means of properly lighting the obstruction or the approaches thereto, or both, as necessity required.

The sanitary district, in seeking to exculpate itself from liability, takes the position that the allegations of the complaint are insufficient. Its counsel point out that under the allegations of the complaint the city was in possession and control of the highway known as Lincoln avenue, and that the sanitary district had under its jurisdiction and control the canal which intersected the highway; that in pursuance of the provisions of pars. 352 and 353, secs. 2 and 3, p. 1340, ch. 42, Ill. Rev. Stat. 1939 [Jones Ill. Stats. Ann. 122.160 and 122.161], the city had accepted the bridge which was constructed by the sanitary district as part of the public highway, and was in control thereof for municipal purposes, and had prior to the date of the accident caused to be paved, maintained and constructed, the highway at the place of the accident, so as to make it comparatively wider than the bridge;

that both defendants had notice of the dangers arising from the bridge, but nevertheless failed and neglected to exercise ordinary care to light the highway and bridge for the purpose of warning the public of the dangers, and that such failure on the part of the defendants constituted negligence; and it is argued that while the allegation of failure properly to light the bridge made a case against the city, it failed to state a cause of action against the sanitary district, but, on the contrary, exonerated it from liability. The gravamen of the argument is that plaintiffs' case is predicated on the failure of defendants to light the highway and bridge, whereas no duty devolved upon the sanitary district to light it. Counsel overlook the fact, however, that the complaint is not based solely on the failure to light, but also upon the charge that both defendants had caused, permitted and allowed the abutments, sides and girders of the bridge and the approaches thereto to be so placed that the same constituted a sudden, abrupt, dangerous narrowing of the highway, and were a dangerous obstruction to travel; that defendants had notice of this condition and both failed and neglected to exercise ordinary care to light the highway and bridge for the purpose of warning the public of the dangers.

It is conceded that the bridge in question was originally constructed by the sanitary district; that it also constructed the approaches to the bridge after the widening of the street, which created a dangerous condition in the public highway; and that it paved the bridge and the roadway leading immediately up to the bridge. Furthermore, it installed the flicker light in question, and through contract maintained and inspected it from time to time. It also erected and maintained the reflector on the girder or abutment in the highway and from time to time repaired the fence which formed a part of the approach to the bridge. The sanitary district is therefore in the position of

having by contract or agreement with the city, or otherwise, which does not appear of record, contributed to the dangerous condition of this construction in the highway, and having so aided therein, either by contract or voluntary undertaking to provide and maintain lights and warning signals so as to adequately safeguard the approach to the bridge, became equally liable with the city for the failure properly to perform the duty it assumed. The fact that the city was also liable, or that the primary duty to keep the highway reasonably safe rested upon the city, does not constitute a defense for the sanitary district. In *Birch v. Charleston Light, Heat & Power Co.*, 113 Ill. App. 229, an injury resulted from a hole caused by the removal of a pole in the highway by the power company, which was not thereafter properly filled. In discussing the respective liabilities of the city and the power company, the court pointed out that while the duty of the city was broader, "for the reason that it would be liable for a defect in the street by whom or whatever created or caused, this fact in no way relieved the power company," and then concluded by saying that "a common duty rested upon both to see that the consequences of the act of the power company did not, or would not in the future, make the street unsafe for persons lawfully using the same. Therefore, if any liability existed at all, the defendants were jointly liable for the injuries to the plaintiff in error." In *Koch v. City of Chicago*, 297 Ill. App. 103, the city and the Welsbach Traffic Signal Company were held jointly liable for the manner in which a traffic signal was maintained in a public highway, and in *Wicks v. Cuneo-Henneberry Co.*, 319 Ill. 344, it was held that a private person who creates and maintains a defect in the public highway is liable, irrespective of the liability of the city.

The evidence indicates that the sanitary district not only constructed and maintained the structure which

constituted a dangerous obstruction to the public highway, but that it also assumed the duty of keeping that part of the public highway safe. Under these circumstances the sanitary district having assumed the duty and failed properly to perform it, with the resultant injury to plaintiffs, made itself liable notwithstanding any liability that might exist against the City of Chicago. (45 Corpus Juris, sec. 18, pp. 645, 646; *Stewart v. Standard Pub. Co.,* 102 Mont. 43, which quotes from the foregoing citation in Corpus Juris, and states the general rule enunciated by text writers and innumerable decisions.)

The principal remaining contention made by both defendants is that two municipal corporations cannot at the same time and within the same territory exercise the same jurisdiction and control, and therefore both cannot be held liable as joint tort-feasors. As we view the case it is not a question of jurisdiction upon which their joint liability is sought to be established, but rather because of the allegations of the complaint and proof that both defendants contributed to the commission of the tort. The city undoubtedly had jurisdiction over the public highway, and any other corporation occupying it or doing anything whatever in connection therewith could do so only by permission of the city, either express or implied. Under decisions hereinbefore cited a third person or corporation using the public highway for any purpose, although exercising no jurisdiction over it, may nevertheless be held liable for his or its negligence, if any, which renders the highway unsafe, either severally or jointly with the city, and we see no reason on principle why two governing bodies may not likewise both render themselves liable for negligence contributing to the injury of the persons lawfully using the highway. Our attention is called to *Muesig v. Harz,* 283 Ill. App. 115. In that case there was no evidence that the village of Tessville had undertaken to maintain the highway,

and we so said in our opinion. Moreover, in that case McCormick road, where the accident occurred, was constructed by the sanitary district under a special statute (ch. 42, par. 347, Cahill's Rev. St. 1931), whereas in the case at bar the bridge was constructed under ch. 42, par. 352 of the statutes (1939), which provided in effect that any bridges built under the provisions of that act, to supply or replace a public street or highway bridge, should, after the construction of the bridge, be operated and controlled for municipal purposes by the city, village or town within which it is located.

The remaining ground urged for reversal relates to the argument of plaintiffs' counsel which defendants say was improper and designed to arouse the prejudice of the jury. The use of the word ''holocaust'' in characterizing the nature of the accident was not objected to at the time it was made and no ruling of the court was had thereon. Neither was the jury instructed to disregard it. The statement that ''the city should· have taken some precaution to put some kind of floodlights there, some kind of light; plenty of electricity there; they had a wire running along under the bridge, sanitary power wire, all kinds of power,'' was objected to by counsel on the ground that there was no evidence to support it. Counsel for plaintiffs insisted that there was, and the court overruled the objection and directed plaintiffs' counsel to ''go ahead and argue your case.'' There is nothing in this complaint which would warrant a reversal and the same may be said of the objections leveled at various of the fifty written instructions tendered by the respective counsel. We have examined them and find that they are directed principally to the question of one or both of defendants' legal liabilities, which are elsewhere discussed in this opinion.

The case was fairly, painstakingly and ably tried and no objection is made to the amounts of the ver-

dicts. For the reasons given herein we are of opinion that the judgments against the City of Chicago and the Sanitary District of Chicago, respectively, should be affirmed. It is so ordered.

*Judgments affirmed.*

SCANLAN and JOHN J. SULLIVAN, JJ., concur.