(No. 6149—

FLORENCE NESTMAN, Administratrix, ETC., Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed August 27, 1975.*

RICHARD W. HUSTED, Attorney for Claimant.

WILLIAM J. SCOTT, Attorney General; SAUL R. WEXLER, Assistant Attorney General, for Respondent.

BURKS, J.

This is a claim for wrongful death. Claimant is the widow and administratrix of the estate of Clifford Nestmann, who died on September 6, 1970, when the motorcycle he was driving collided with a safety island and traffic sign on Highway 31, immediately north of its intersection with Virginia Road in McHenry County. The court's jurisdiction is stated in the Court of Claims Act, §8(d).

The State's liability, if any, must be based on a finding that the Respondent was negligent; that its negligence was the proximate cause of the death of Claimant's husband; and that the decedent was free from contributory negligence. *Howell, Administrator of the Estate v. State, 23 Ill.Ct.Cl. 141.* Before determining these issues, we summarize the facts in the record as follows:

Very early in the morning of September 6, 1970, at about 3:30 a.m., Claimant's husband was travelling southward on Illinois Route 31, approaching its intersection with Virginia Road. It was dark. He was operating a motorcycle, and was the lead vehicle of two other motorcyclists who were his companions. He was travelling just inside and to the right of the white center line of Route 31.

At this point Route 31 heads straight north and south for a distance of several miles. The only deviation from a straight southerly course, which Claimant's husband was travelling, was immediately north of the intersection with Virginia Road. There southbound travelers, due to the recent reconstruction of the intersection, were required to swing out to the right to pass a recently constructed safety island.

The reconstruction of the intersection included the placement on Route 31 of an elongated curbed island in the middle of the highway, 433 feet in length. South-

bound traffic was required to swing out to the right to go around it. From the north point of this island, a corrugated, raised rumble strip extended northward an additional 150 feet.

The construction was completed, and Route 31 had been reopened for traffic for 20 days. A reflectorized sign reading "KEEP RIGHT" was in place on the island approximately 33 feet south of the island's north tip. This sign faced and warned southbound traffic.

Claimant's husband, traveling approximately 60 to 65 miles an hour, which was then within the speed limit, traversed the raised rumble strip in the middle of the highway, struck the north point of the island, and continued on, striking the right edge of the "KEEP RIGHT" sign. He was thrown from his vehicle, struck the pavement some great distance from the point of impact, and was pronounced dead on arrival at the hospital in Elgin.

Prior to the reconstruction of this intersection, there had been for several years an overhead yellow blinker light which operated 24 hours per day in the center of the intersection. This light provided some illumination, but its primary purpose was to warn approaching motorists of the intersection. After the reconstruction of the intersection this light was removed, and new lighting was installed. It is undisputed that, at the time of the accident, there was no overhead light fixture in the immediate vicinity of the north end of the island where the accident occurred. The evidence is conflicting as to whether the intersection itself was illuminated, and, if so, how well. The evidence is also conflicting as to exactly what warning signs were in place at the time of the accident. These disputed matters are discussed more fully below when we deal with the alleged negligence of the State.

Claimant, in her brief, states her theory that the State was negligent as follows:

1. In failing to continue lighting this intersection, after having done so for years, and after claiming that it recognized need for, and had installed, new lighting on May 22, 1970, some three months prior to the collision resulting in death.

2. In failing to light the hazardous part of the intersection, i.e., the approach to the island where the pavement curves to the right to go around the island; and

3. In failing to provide warning signs or blinkers on such approach.

These points will be discussed in the order stated.

■ Alleged failure to light the intersections.

Claimant's two eye witnesses, the other two motorcyclists travelling with Claimant's husband, testified that the intersection was totally without illumination at the time of the accident. Decedent's father-in-law testified that at about 6:30 a.m. the morning of the accident he went to the scene of the accident and found that the light pole was down, not having yet been installed, and that there were no lighting fixtures overhead. Another of the Claimant's witnesses, Byron Brouty, whose parents lived near the intersection, testified that no lights were installed at the intersection until a year after the accident, and then they were installed on wooden poles.

The testimony of this witness, like that of the decedent's father-in-law, that the light at the intersection had not been installed at the time of the accident, is clearly contradicted by the weight of the evidence discussed below: the observation of the police officers called

to the scene; the business records of Commonwealth Edison; and the records of Respondent's Division of Highways.

Edward Sachel, an officer of the Cary Police Department, knew that the overhead lights were in place at the time of the accident but could not say whether they were on, since his own car lights shown on the motorcycle, on Mr. Nestmann's body, and provided all the light he needed.

When this officer arrived at the scene, he saw two men fighting. They were later identified as Claimant's two eye witnesses who were members of a motorcycle club, the "Tin Ponies," and who were threatening Deputy Sheriff Edgar Fair because he hadn't moved the decedent's body.

Edgar Fair, Deputy Sheriff of McHenry County, could cast no light on the question of whether the overhead lights were on. He couldn't recall, because he was so frightened and shook up at the time. One of the other motorcyclists had threatened to kill him if he didn't take his friend to the hospital in the squad car instead of waiting for the ambulance he had called.

George A. Stackhouse, an Algonquin policeman, testified that he arrived at the scene of the accident shortly after it occurred, and that the area was well lit by big arc lamps.

The officer said the area was so well lighted that he did not need to use his flashlight; that, in fact, he was able to see and to pick up small pieces of the bike. On cross-examination,he officer's testimony was unshakable. He testified that "we had no trouble in seeing and even in picking up small bits of metal". He was also positive that the illumination was provided by the overhead lights and not by car headlights.

In our opinion the testimony of Officer Stackhouse that the area was well lit by arc lights should be accepted, even though he was in error in describing the lights as blue rather than amber, as stated below by Commonwealth Edison.

Pursuant to a subpoena, Mr. Joseph J. Stephens, of Commonwealth Edison, testified that his company installed two mercury vapor lights of 15,000 lumen power each at the intersection on May 22, 1970, three months before the accident. Mr. Stephens further testified that the lights were ordered by, and billed to McHenry County Division of Highways, and that Commonwealth Edison had the responsibility for maintaining these lights. The records of Edison, also subpoenaed and admitted into evidence, indicate that there was no interruption of electrical facilities or malfunction in these lights for the month of September, 1970, nor did Edison ever learn of a malfunction in these lights even though, in such an instance, they always eventually do. The lights installed were of an amber color, rather than the conventional blue. Mr. Stephens explained that amber is a more dramatic light than blue to call attention to the intersection, and that these lights were visible from a distance of several miles. In this connection, we notice that the evidence shows that the approach to this intersection from the north was straight and level for almost two miles.

The preponderance of the evidence does not support Claimant's first contention that the intersection was not adequately lighted at the time of the accident.

Alleged failure to light the hazardous part of the intersection. Claimant is correct in that there was no additional light at the northerly tip of the safety island which the decedent hit. The Court takes judicial notice of the fact that, while mercury amber lights can be seen

for great distances, they would not fully illuminate the tip of the island several hundred feet north of the intersection. Respondent's color photos, admitted into evidence, show the great distance of the lighting fixtures from the northerly tip of the island. Respondent's Exhibit 3 is also significant in this regard, showing that the two light fixtures are installed at the very southern margin of the intersection. Additional overhead lights at the north end of the island would, no doubt, have been an added safety factor. The Court cannot say, however, that the State was actionably negligent for failing to install such additional lighting at the northern tip of the safety island in view of the 150 foot rumble strip warning at the approach to the island, the numerous reflectorized warning signs discussed below, and the fact that there was much better lighting at the intersection than had previously existed.

Claimant relies heavily on the fact that the intersection was formerly lit by one yellow, flashing warning light. Obviously, if two amber mercury arc lights did not light up the tip of the safety island, a blinking yellow light 500 feet south of the scene would not have done so either. The previous blinking light at the intersection was a caution light only and did not illuminate the intersection. Claimant's contention that the State failed to *continue* lighting this intersection is without merit.

■Alleged failure to provide warning signs or blinkers. Although Claimant's witnesses gave conflicting testimony as to the type and number of warning signs, the evidence clearly establishes that the following signs were in place at the time of the accident: (1) A diamond-shaped "CENTER CURB AHEAD" sign more than 500 feet north of the island; (2) a "side-road" sign 600-700 feet north of the intersection; (3) a diamond shaped sign depicting a "staggered intersection"; and

finally (4) the "KEEP RIGHT" signs on the island itself; all of these were in place at the time of the accident, and were reflectorized.

This testimony, confirmed by other witnesses, was given by William Carl Brandt, Jr., of the Division of Highways, who was responsible for signs and pavement markings for the area in question.

Joseph Kostur, of the Division of Highways, prepared Respondent's Exhibit 8, a diagram of the area in question showing the aforesaid signs, their position, and where the street lamps were placed. This document's accuracy was verified by Brandt, by the Commonwealth Edison representative, and by the three police officers. Hence we find Respondent's statement of facts concerning the reflectorized warning signs supported by a preponderance of the evidence.

The evidence also shows that the curb of the island was reflectorized, and that the highway had been restriped with a reflectorized center line and edge lines. The 150 foot rumble warning strip approaching the island was also in place. Claimant's assertion that the safety island was a "death island" is further contradicted by the accident statistics submitted by the Respondent.

The cases cited by Claimant do not support her theories as to Respondent's alleged negligence. In *Chicago v. Powers, 42 Ill. 169,* a 1866 case, the Court ruled that previous accidents were admissible where a pedestrian fell off of a swinging, unlit bridge. In the case at bar, the only testimony as to previous accidents was produced by Respondent during presentation of its case-in-chief. This evidence clearly established that the number of accidents at the intersection had declined as a result of the reconstruction of the intersection. In *Jockens v. City of Chicago, 6 Ill.App.2d 144, 127 N.E.2d*

*142,* the court ruled that the city did not have adequate notice of the non-functioning of a temporary fixture. In *Baras v. City of Chicago Heights, 99 Ill.App.2d 221, 240 N.E. 381,* the Court ruled that where it was alleged that the city was negligent in the way it lit an intersection, *and expert testimony was given* as to industry lighting standards, then a question of fact was raised for the jury to determine. There was no expert testimony offered by the Claimant in the case at bar, and we find no proof that the lighting was inadequate or violative of industry standards. In fact, the evidence was that the lights placed were particularly visible for a distance of miles to call attention to the intersection.

As to Claimant's contention that the State was negligent in constructing a "curbed island" in the intersection and for failing to light it, she cites *Huyler v. City of Chicago, 326 Ill.App. 555, 62 N.E.2d 574; Rohwedder v. Chicago, 332 Ill.App. 700, 53 N.E.2d 495;* and *O'Connell v. Chicago & North Western Railroad Co., 305 Ill.App. 430, 27 N.E.2d 644.* The first two cases are abstract opinions only. *Huyer* apparently hinged upon plans for reflectorized buttons which were not installed, as well as a similar accident prior to the one at bar therein. In the case at bar, the evidence clearly established that all plans for signs and striping were fully implemented prior to the accident, as well as the absence of any similar mishap either before or after Nestmann's fatal accident. In *Rohwedder,* another abstract opinion, the case turned upon the concealment of an island and pole due to a snowstorm. The *O'Connell* case involved a suit by a passenger (and hence no contributory negligence) for injuries sustained in a car collision with an unlit dirty gray or black railroad trestle which was unpreceded by any signs. In the case at bar, the adequacy, position, and number of signs in place were clearly established. Claimant's "inadequate lighting" theory has been previously discussed.

In support of her theory that the State failed to provide warning signs in advance of the intersection, Claimant relies on *Wells v. Kenilworth, 228 Ill.App. 332.* In *Wells*, the Court reversed a directed verdict for defendant and remanded the case for new trial on the grounds that certain questions of fact which should have gone to the jury were raised. In that case, plaintiff drove into an unlighted safety island lamp post maintained by the department which was two feet square and ten feet high. The salient points in *Wells* were as follows: (1) The lamp post was unlit; (2) it was shaded by trees; (3) it had been struck a few days before under the same conditions by a truck; (4) the department was responsible for turning on the lights; (5) there were no advance warning signs to advise of the presence of the island. All of these facts differ from the evidence in the case at bar.

Finally, it is clear to the Court that even if we could find some degree of negligence on the part of the State in this case, it was not the proximate cause of the accident. The preponderance of the evidence supports our finding that the negligence of Claimant's intestate was the proximate cause of his fatal accident. He was certainly not free from any contributory negligence.

This Court has always followed the rule that contributory negligence on the part of a Claimant is a bar to recovery of damages. The contributory negligence rule was carefully reconsidered and reaffirmed by the Illinois Supreme Court in *Maki v. Frelk, 40 Ill.2d 193.* This rule makes it incumbent upon the Claimant to prove that her husband did nothing to contribute to the accident. *Emm and Vanda v. State, 25 Ill.Ct.Cl. 213.*

The deceased's two companion motorcycle drivers each saw the safety island as they approached it. Even if the deceased had been unfamiliar with the intersection, he should have been able to see what the others saw in the same existing light.

72

Claimant's eye witness, James Clark, testified as follows:

Well, we were going down the road. Like I say, they were in front of me a ways. It looked to me like Cliff [Nestmann] was going a little too close to the center curb.

I was going to say something before, but I didn't. It looked like he was getting a little too close to it [the safety island]. I thought maybe he was going to swerve at the last minute or miss it.

Then all of a sudden I seen the sparks flying from his motorcycle when he hit the ground. Then I knew he hit the curb.

The other eye witness, Patrick Beckman, testified as follows:

Well, Cliff Nestmann and I were in the lead. Jim had a problem with his bike, and we were in the lead. I was just a little bit behind him. He was in the left, like where the left tire of a car would ride. He was riding there, and I was riding to the right. As we approached the intersection he hit the curbing there. He went on the rippled part and hit the curbing, and that's where he got killed.

It appears to the Court that the deceased had ample opportunity to go around the safety island, but without any deviation in his course whatsoever, traversed all or part of the rumble strip, a distance of 150 feet, and then hit the north end of the island dead center.

There was nothing to obstruct decedent's view of a well posted and illuminated intersection, the presence of which was clearly marked by several reflectorized signs as well as reflectorized striped markings, and a 150 foot rumble strip. He was driving at a speed of 60 to 65 mph on a high-powered motorcycle which had been modified, and whose standard tire with a four and one-half inch tread had been replaced with one of only a three inch tread. It was on this high speed vehicle that the decedent met his death, and which was ultimately buried with him, according to the testimony of his companion, Patrick Beckman.

Prior to the accident, deceased was apparently driving in the very center of the highway. He ran straight

into a reflectorized sign with his headlights on. Moreover, he had passed the island earlier in the evening going north, and should have known that it was there. At the time of his demise, Clifford Nestmann's driving license had been suspended, the second such suspension he had received.

The evidence shows that Mr. Nestmann was familiar with the intersection in question and had driven past it only a few hours before his fatal accident. Testimony of one of the eyewitnesses also established that there was no change in conditions during this brief period of approximately four hours. One who has earlier the same evening traveled over a certain stretch of highway is charged with a knowledge of its condition so long as the condition is unchanged on his return trip. To approach a place of known danger without care commensurate with such danger is contributory negligence. *Doolittle v. State, 21 Ill.Ct.Cl. 112; Mason v. State of Illinois, 21 Ill.Ct.Cl. 446; Mounce v. State of Illinois, 20 Ill.Ct.Cl. 268; Link v. State of Illinois, 24 Ill.Ct.Cl. 69.*

An analagous situation was presented to this Court in *Sam Weisman v. State of Illinois, Ill.Ct.Cl. No. 5233, filed May 9, 1972.* In *Weisman* the Claimant, while driving his automobile at night, struck a metal guard rail serving as a lane divider on the Dan Ryan Expressway. In that case there was a rumble strip about 100 feet long in front of the divider, which we said "would give every driver ample warning of the existence of the divider ahead" and, moreover, "Claimant had been over the road on at least one previous occasion."

This Court has also stated and followed the rule that it is the duty of every driver to maintain control of his vehicle, and the failure to do so amounts to negligence. *Schuck & Maryland Casualty Co. v. State, 25 Ill.Ct.Cl. 209.*

While the Court regrets the tragic death of Clifford Nestmann, this claim must be, and is, hereby denied.