## City of Chicago v. Evert Baker.

1.  MUNICIPAL CORPORATIONS—*Must Keep Sidewalks in Reasonably Safe Condition—When Notice of Defect Presumed.*—A city must keep its sidewalks in a reasonably safe condition for public travel, and where a sidewalk in a public street remains in an unsafe condition for a considerable time, notice to the city of the defective condition is presumed.

2.  SAME—*Duty as to Placing Railings on Sidewalks.*—Where a sidewalk is so near to an excavation, steep embankment or other dangerous place, as to render it unsafe, it is the duty of the city to guard the walk by railings or barriers in such manner as to prevent accidents, or at least warn passers-by of the danger.

3.  SAME—*Sidewalks—Duty to Keep Them in Repair on Private Grounds.*—When a city so acts in reference to a sidewalk as to hold it out to the people as a public thoroughfare, it thereby invites the public to use it as though belonging to the city, and will be liable for damages for an injury resulting to a party from its neglect to keep such sidewalk in proper repair, although the sidewalk at the place of the injury is in fact on private property.

4. DAMAGES—*Where $6,000 Not Excessive.*—Where a young man is injured by a fall from a sidewalk and sustains a fracture of the thigh bone, rupture of the ligaments of the knee joint and a fracture of the lower bone supporting the frame of the eye, a verdict for $6,000 is not excessive nor does it indicate that the jury were partial, prejudiced or had a misconception of the facts.

**Action on the Case,** for personal injuries. Appeal from the Superior Court of Cook County; the Hon. MARCUS KAVANAGH, Judge, presiding. Heard in this court at the October term, 1900. Affirmed. Opinion filed June 10, 1901.

**Statement.**—This is an appeal from a judgment for the sum of $6,000, rendered in an action on the case in favor of appellee and against appellant, for personal injuries alleged to have been occasioned by appellant's negligence.

The following plat shows the place of the accident:

City of Chicago v. Baker.

## PLAT OF SURVEY

OF

South part of lots 5, 6 and 7, block 57, Section 16, Town 39 N., Range 14
E. of 3rd P. M , showing Buildings, Walks, Driveway, and Profile of Same.

Scale 10–1 inch.

Survey, April 26, 1900.
GEO. C. WATERMAN, Surveyor.

The space marked " sidewalk " is a plank sidewalk twelve
feet wide, on the west side of Canal street, and the west

line of that sidewalk is the west line of the street. The shaded space marked "Plank sidewalk" is on private ground and is in width from east to west twelve feet, and fifty feet in length from north to south. This sidewalk and the sidewalk first mentioned are on the same plane, on a level. There is no visible line of demarcation between them. Apparently they are parts of a single sidewalk. The space next south of the space marked "Plank sidewalk," which is marked "Planked inclined driveway," is, as the name indicates, an inclined driveway. It is ten to twelve feet wide from north to south and runs down on a decline from the west line of the sidewalk on the west side of Canal street to the ground, inside a vacant lot. The triangle at the southeast corner of the plat shows the decline of the driveway. Between the east end of the building marked "two-story frame building" on the plat, and the "planked inclined driveway," is an open space the width of which, from north to south, is estimated by the witnesses at from five to eight feet. The perpendicular distance from the sidewalk to the ground is estimated by the witnesses at from ten to fifteen feet. Claussen, who had been a private watchman in the vicinity of the place in question for about five years before the accident, testified that the sidewalk, including the space marked "Plank sidewalk," had been in the condition above described for a long time, with the exception that about a year before the time of the accident there was a fence or barricade at the place where it happened. There was no guard of any kind on the north or east side of the inclined driveway at the time of the accident, nor had there been for a year. It appears from the evidence that formerly the two-story frame building north of the driveway was used as a machine shop, and that the space marked "Plank sidewalk," in front of the building, was used by the occupant of the shop to place machinery on, but that such use was discontinued about three years before the accident, since which time it was used by the public as a part of the sidewalk. Fred Roth, who lived on Canal street, a short distance from the place in question, testified that he was familiar with the

place, and had been for ten or twelve years, and that he saw the public using the space marked "Plank sidewalk" almost every day. Edward A. Neilson, who lived about 200 feet from the place of the accident, was asked in reference to the private sidewalk, and answered as follows:

Q. "What, if any, use did the public make of it, if you know?"

A. "Why, they could walk on that sidewalk the same as they did on the public sidewalk."

He also testified that he had frequently seen people walking on it, and had walked on it himself prior to the accident. Appellee testified that after he got out of the hospital he examined the place of the accident, and that then there were banisters there.

Frank Huntley, a witness for appellee, testified that May 11, 1899, between 8:30 and 9 o'clock P. M., the night being very dark, he and appellee walked angling across Canal street from the east side of the street, till they struck the sidewalk on the west side of the street; that they thought they were walking in the center of the sidewalk; that appellee was on the right side of the witness, and suddenly appellee stepped off onto the driveway, and that he, the witness, ran against a post on the north side of the hole; that they were walking about twelve feet from the curb when the accident occurred; that witness, after appellee disappeared, went down the driveway and found appellee, and then went next door and found a man who accompanied him to the place where appellee was lying, which was between the shop and the driveway, meaning the open space between the "two-story frame building" and the driveway; that appellee "was knocked silly," and that a watchman called a patrol wagon and appellee was taken to the hospital. Claussen, the watchman, testified that he found appellee lying between the driveway and the boiler shop, meaning by the latter the two-story frame building.

Appellee's evidence as to the manner of the accident is substantially the same as that of Huntley. The evidence as to appellee's injuries is, in substance, as follows:

J. T. Thoren, a physician and surgeon, testified:

"I know Evert Baker, the plaintiff. The first time I saw him was in May, 1899, in Cook County Hospital. I made an examination of him. He had a common fracture of the thigh bone; the right thigh bone; that is a crushing injury to the bone of the leg, a rupture of the ligaments supporting the knee joint; and also had a fracture of the lower bone supporting the frame of the eye. Examined him again last Friday at my office. I found that there is about two inches and a half shortening of the leg at the place of the fracture. There is a large callous due to pressure. It obstructs the circulation of that leg and in consequence there is a shortening of the muscles of the leg. The right knee joint, the ligaments have failed to reunite, and consequently the joint is left without support, and if any heavy weight is put upon that leg there is a tendency to throw the joint out of place. The conditions described are absolutely permanent. I made an examination as to the motion of the knee joint. There is ankylosis of both the knee and the hip, partial ankylosis, that is, a stiffening of the joints. There is no cure for the conditions described. The leg will always have to be supported by mechanical appliances, either a crutch, or cane, or brace, in order to keep that knee joint in place. As to the shortening, it can not be overcome. You can not lengthen or shorten a leg. The callous being so extensive there will be a tendency to more shortening of the muscles in time to come, owing to the fact the nutrition is impaired from the pressure of the callous. As far as a cure is concerned, there is absolutely none. As to the progress of the disease, it is in favor of getting worse."

Q. "What, if any, effect, Doctor, will that have upon the ability to labor, for that limb?"

A. "Well, he will be unable to support the weight of the body without the support of a cane or crutch, consequently he will not be able to perform any other labor than he can perform with the one hand, using the other for the support. There was a fracture of the lower margin of the bone supporting the eye, and in the healing process there has been a separation of the fragments, which leaves a keyhole shape opening, which leaves the eye practically unprotected should the man ever meet with any violence to the eye. I made the rounds twice a day in the hospital and treated Baker about two and one-half months."

John D. McGregor, physician and surgeon, testified:

"Am assistant surgeon of the Northern Pacific for two

years; I know the plaintiff, Evert Baker; have made an examination of him about three or four months ago. I found the evidence of a fracture of the right femur—the thigh bone here. There was considerable shrinking of the right leg, and on measurement I found that there was two and a half inches shrinking of the right leg, and at the seat of the fracture there was a large callous formed around the bone and the fragments of the bone had slipped and it looked as though it had been a comminuted fracture. I mean by that, a fracture where the bone had been crushed and ground up—broken in several places and directions; and on an examination of the knee I found that the motion of the knee was impaired; he couldn't bend his knee quite down to right angles, and there was also crepitation. He couldn't get his knee bent any further than almost right angles, and he couldn't flex his left leg back, that is the thigh, at all. You could detect the bones knocking right against the other bones, and you could hear it knock. The patella knocked against the other bones. The patella is the bursæ; the little sac that protects the knee-joint in front there has been ruptured. There is also some loss of motion in the hip joint, though there is not as much loss of motion in the hip joint as there is in the knee. This piece here right under the eye, there has been a fracture of the lower rim of the socket of the eye here, and the fragment has slipped down, leaving a hole right in there, so that the protection from the lower side is gone—the protection to the eye. This bone here that protects this side has been broken and has slipped down and united poorly. You can see the deformity in his face, but the deformity is not so much as the danger from the deformity, as that there is no protection to the eye. The condition of the leg is permanent. There is nothing that can be done to help it. I think it will get worse as it goes along on account of the fact that the nutriment is cut off there. The circulation is greatly impaired in the right leg, and therefore it can not develop. The leg is practically useless; the leg is not strong enough to support the body. He has got to have a mechanical support, that is, he has got to use a cane or a crutch to help himself along. He would only be able to labor with one hand unless he was working sitting down."

Appellee testified that he lay on his back in the hospital for sixty-four days and suffered great pain; that they had to give him medicine to induce sleep; that after the sixty-four days they took the extension off his leg and put a

plaster of paris cast on; that subsequently he walked on crutches, afterward with two canes, and lastly with one; that he had done no work since the accident (the trial occurred in July, 1900); that he could not labor; that it was all he could do to walk. The following occurred on the cross-examination of appellee:

Q. "Will you consent to an examination by a physician representing the city? A. It will be just as good to have some disinterested party that don't know any one of us, to examine me. I think that would be the proper thing; some one that don't concern us; some one that is disinterested. I am willing to let any one examine my injuries that is disinterested on either side. My injury shows for itself."

By Mr. Murphy, appellee's attorney:

" And I will consent to that."

Appellant did not avail itself of this consent.

Appellee was about twenty-eight years old at the time of the accident, and had been earning from $1 to $1.50 per day.

Appellant introduced no evidence. The jury rendered a verdict for $12,833, and on motion for a new trial the court required a remittitur of $6,833, and judgment was entered for $6,000 and costs.

ANDREW J. RYAN and GEORGE E. GORMAN, attorneys for appellant; JAMES J. KELLY, of counsel.

FRANCIS T. MURPHY and THADDEUS S. ALLEE, attorneys for appellee; EDWARD C. HIGGINS, of counsel.

MR. PRESIDING JUSTICE ADAMS delivered the opinion of the court.

Appellant's counsel state their contentions as follows:

" I. That the city is under no obligation to erect barriers to prevent pedestrians from straying outside of the line of a public highway, when that highway is admitted to be in good and safe condition for travel.

II. That appellee is shown by his own evidence to have been guilty of contributory negligence in going or straying to the point where the accident occurred.

City of Chicago v. Baker.

III. As to the allegation that Canal street, at the place of the accident, was unlighted or insufficiently lighted, no showing is made that appellant undertook to light said street, and the well settled law of this State is that no duty rested upon appellant so to do.

IV. The court erred in admitting certain testimony offered by appellee over appellant's objection.

V. Lastly, we contend that the damages awarded by the jury were so excessive as to indicate such partiality, prejudice or misconception as would make the verdict (if a cause of action exists in this case) one which could not be cured by the remittitur, which was entered for the larger part thereof; and that the amount for which the trial court rendered judgment ($6,000) is excessive."

In support of the contention that the city was under no obligation to erect barriers, counsel for appellant cite the following cases: Sparhawk v. Salem, 1 Allen, 30. In that case the alleged defect was the absence of a fence at the side of the highway. The highway adjoined certain land of a railway company, which was level and smooth, and about forty feet from the highway was the railway station, at one end of which there was an embankment. The driver of the plaintiff's carriage, in the evening, drove from the street across the intervening land of the railway company, and down the embankment, by reason of which the plaintiff, who was in the carriage, was injured. *Held*, there could be no recovery. The court, referring to certain cases, say:

" These cases require the party to show that the defect which caused the injury existed either in the highway, or so immediately contiguous to it as to make it dangerous to travel on the highway itself," etc. Alger v. Lowell, 3 Allen, 402.

The facts in that case were as follows: On the north side of the street, and between the line of the street and the houses fronting on it, there was an open space, not separated from the street by any fence or railing, about four and one-half feet wide and twenty feet long; that at one end of the open space a passage way, from sixteen to twenty-two inches below the level of the open space, and not separated from it by any fence or railing, began, which passage way led to the rear of the houses; that the plaintiff was passing

along the street in a large crowd of people, by whom he was pressed into the open space, from which he stepped onto the passage way, fell and was injured. *Held*, that he was entitled to recover. The court say :

" The true test, on the contrary, is not whether the dangerous place is outside of the way, or whether some small strip of ground, not included in the way, must be traversed in reaching the danger, but whether there is such a risk of a traveler, using ordinary care in passing along the street, being thrown or falling into the dangerous place, that a railing is requisite to make the way itself safe and convenient."

How this case can help appellant, we can not perceive. In Adams v. Inhabitants of Natick, 13 Allen, 429, the court say :

" Whether or not such a railing is necessary for the reasonable security of the public, is a question which depends very much upon the circumstances of the particular locality in reference to which the question arises. But the essential and invariable term, or element, in all cases where a railing is required, is some dangerous object or place outside of the required railing, in or upon which the traveler may come to harm, if not warned or detained therefrom by the railing."

In Murphy v. Gloucester, 105 Mass. 470, the cases in first, second and thirteenth Allen, cited *supra*, are referred to with approval. In Stockwell v. Fitchburg, 110 Mass. 305, the plaintiff, in walking from a hotel to the street, fell into a cellar way. It did not appear from the evidence that he had been on the street at all. In Williamsburg v. Frothingham, 122 Mass. 391, it appeared that the plaintiff's horse, being frightened by a railroad train which crossed the road at grade, turned abruptly from the road, which ran north and south, and ran from twenty to thirty feet across the land adjoining the road on the east, to the bank of a river; that the plaintiff, who was driving, directed the horse down the river bank to the foot of the bank, when the horse fell and the plaintiff was thrown from his buggy and injured. *Held*, that there was no dangerous place so near to the highway as to require a railing or barrier, and that there could be

no recovery. But the court also held that " A town is bound to erect barriers or railings where a dangerous place is in such close proximity to the highway as to make traveling on the highway dangerous," citing prior cases. In Daily v. Worcester, 131 Mass. 452, the dangerous place where the plaintiff fell and was injured was more than twenty-eight feet from the highway.

None of the foregoing cases, all of which are cited and relied on by appellant's counsel, support their contention, and the majority of them are against it.

In Jewhurst v. City of Syracuse, 108 N. Y. 303, the plaintiff was injured by reason of a defective plank next to, but outside the limits of the street. The referee reported that for a year before the accident the sidewalk had been in an unsafe and dangerous condition; that it was constructed of two twelve-inch planks running lengthwise of the street, with one foot of space between them to be filled in; that the plank, by the breaking of which the plaintiff was injured, was on the north side of the sidewalk and outside the line of the street, while the adjacent plank was within the limit of the street, and that there was no mark or indication as to where the true north line of the street was; that the sidewalk was, ostensibly, a sidewalk on the street, and that the contrary could not be ascertained without survey and measurement; that the defendant had permitted the walk to remain apparently a sidewalk on the street, for the use of the public, and that the same was extensively used by the public. The court held that the plaintiff was entitled to recover, saying, among other things:

" I do not see how it could be said, as matter of law, that the city might be responsible for damages arising from the existence of an excavation or an obstruction, such as a post, and yet free from such liability arising from a sidewalk rendered dangerous from being out of repair. If the sidewalk outside of the limits of the street were dangerous, because out of repair, I think the street itself may be said, under the same facts, to have been in a dangerous condition, and that the city was liable so far as this question goes, for injury arising therefrom."

The duty was incumbent on appellant to keep the side-walk in a reasonably safe condition for persons passing along it, and using ordinary care for their own safety, and we think it abundantly established by adjudged cases, that when a sidewalk is so near to an excavation, steep embankment, or other dangerous place, as to render it unsafe, it is the duty of the municipality to guard the walk by railings or barriers in such manner as to prevent accidents, or at least warn passers-by of the danger. Alger v. City of Lowell, *supra;* Hayden v. Inhabitants, etc., 7 Gray 338; Detwiler v. City of Lansing, 95 Mich. 484; Drew v. Town of Sutton, 55 Vt. 586; City of Lincoln v. Beckman, 23 Neb. 677; City of Oklahoma v. Meyers, 46 Pac. R. 552; Davis v. Hill, 41 N. H. 329.

In the case last cited the court say :

" It seems entirely clear, upon the authorities, that the want of a sufficient railing, barrier and protection to prevent travelers passing upon a highway from running into some dangerous excavation or pond, or against a wall, stones, or other dangerous obstruction, without the limits of the road, but in the general direction of the travel thereon, may be properly alleged as a defect in the highway," citing a number of cases.

In Thompson on Negligence, Vol. 2, p. 769, the author says :

" When the limits of the highway are not indicated by any visible object, and there is nothing to show a person driving thereon in the evening that the course he is pursuing is not within the way intended for public travel, the town is liable for an accident to a traveler resulting from a defect within the general course and direction of travel, where travelers are accustomed to pass along the highway although without the limits of the located way, if so near as to render the traveling there dangerous, in the condition in which it is at the time of the accident, and there is nothing to give travelers notice of the defect until too late to avoid it."

The Supreme Court of this State has recognized the law to be, that a municipality may be liable for injuries resulting from a defective sidewalk, even though the walk is

City of Chicago v. Baker.

constructed on private property, when the municipality treats it as a public walk and permits it to be used as such. Village of Mansfield v. Moore, 124 Ill. 133.

In Hogan v. City of Chicago, 168 Ill. 551, 559, the court say :

" If a sidewalk built by an individual is used by the public, with the knowledge of the city authorities, the law will require them either to remove the sidewalk or to assume responsibility for its reasonably safe condition. (Village of Marseilles v. Howland, 124 Ill. 547.) When the authorities so act with reference to the sidewalk as to hold it out to the people as a public thoroughfare, they thereby invite the public to use it as belonging to the municipality. Village of Mansfield v. Moore, 124 Ill. 133."

In the present case the part of the sidewalk in the street and the part west thereof were on a level; there was no visible line of demarcation between them; they formed apparently one sidewalk; they were so used by the public for so long a time that appellant must be presumed to have known of such use, and it was clearly a question for the jury whether the open space into which appellee fell was in such dangerous proximity to the walk as to require appellant, in the exercise of reasonable care, to place a railing or barrier next to the open space, to protect persons passing that way.

The evidence is that at the time of the accident it was very dark, so much so that looking down from the walk to the place where appellant fell, he could not be seen, and a lantern had to be procured to render him assistance. The nearest street lamp was at the corner of Polk and Canal streets—too far away to give any light at the place of the accident. Appellant's counsel argue that, although the city had power to light the streets, it not appearing from the evidence, as they claim, that it had undertaken to exercise that power, the duty was not incumbent on it to maintain lights, and therefore appellee can not rely on the absence of light. The proposition is untenable. The place was a dangerous one, and it was the duty of appellant to protect passers-by against the danger in some way, either by railing, which would prevent such accidents as happened to appel-

lee, or by a light, which would disclose the dangerous place to persons approaching it, or by some other means. Had there been a light sufficient to disclose the danger, counsel would have been swift to urge that had appellee used his eyes the accident would not have occurred. Fred Roth having stated that there was nothing on the north side of the driveway at the time of the accident, was asked if there had ever been a fence there, which question was objected to, not as leading, but generally, and the witness answered that at one time, but how long ago he could not tell, there was a common tie board fence there. It is contended that this evidence was incompetent. We are inclined to think otherwise. Actual knowledge of appellant of the condition of the place was not proved, and appellee's counsel relied on proof that the place had been in the condition in which it was at the time of the accident, for so long a time prior thereto as to give rise to the presumption that appellant must have known its condition. Hence proof of its condition at times prior to the accident was not irrelevant. But even on the hypothesis that the evidence was improperly admitted, we do not think its admission sufficient ground for reversal.

We are of opinion that the jury were warranted by the evidence in finding that appellee was exercising ordinary care at the time of the accident, and that the city was guilty of negligence which caused the accident.

We can not sustain appellant's contention that the amount assessed as damages by the jury is such as to indicate partiality, prejudice or misconception on their part, or its contention that the amount of the judgment is excessive; nor, in view of appellee's injuries, are we prepared to say that if judgment had been rendered for the full amount assessed by the jury, we would have been inclined to reverse it on the ground of excessiveness.

Appellee was a young man when injured. There is nothing to indicate that prior to that time he did not enjoy ordinary health and strength. He earned his living by daily labor. His injuries have totally incapacitated him for

active work. He has suffered great and continuous pain, and his prospect is that he will grow worse rather than better.

The judgment will be affirmed.