CHARLES JANSSEN, Plaintiff-Appellee, *v.* THE CITY OF SPRINGFIELD, Defendant-Appellant.

Fourth District   No. 15148

Opinion filed February 14, 1979.—Modified on denial of rehearing April 23, 1979.

Thomas P. Schanzle-Haskins, Assistant Corporation Counsel, of Springfield, for appellant.

Brown, Hay & Stephens, of Springfield (Edward J. Cunningham, John H. Squires, and Mark H. Ferguson, of counsel), for appellee.

Mr. JUSTICE GREEN delivered the opinion of the court:

Defendant City of Springfield, appeals from a judgment of the circuit court of Sangamon County in the sum of $250,000 entered against it on March 6, 1978, pursuant to a jury verdict in favor of plaintiff Charles Janssen. The suit was brought to recover for severe personal injuries received by plaintiff in the early morning hours of August 26, 1973, when a motorcycle he was riding collided with a traffic island located at the intersection of Fifth and Stanford Streets in Springfield.

In the area in question, Fifth Street was a one-way street with traffic limited to that going in a southerly direction. Plaintiff was proceeding in that direction and was in the left lane of Fifth Street as he approached the intersection. Initiating just prior to and carrying through the intersection, Fifth Street curved to the left, or the east. A three-sided safety island was located at the southeast corner of the intersection, separating traffic continuing on the through portion of Stanford Avenue from a separate traffic lane which enables westbound traffic on Stanford to bear to the left,

make a left turn, and enter Fifth Street some 50 feet southeast of the intersection. The west edge of the traffic island extended some 5½ feet into the curving left lane of Fifth Street. The accompanying diagram depicts the intersection at the time of the collision.

The theory of plaintiff's complaint was that defendant had a duty to warn the traveling public of the hazard presented by the projection of the safety island into Fifth Street or to remove it and negligently failed to do either. Defendant contended that it had a duty to do neither. On appeal, it

maintains that the verdict was, accordingly, contrary to the manifest weight of the evidence and that the court erred in instructing the jury.

John E. Bierwalt, a college professor, engineer, and expert on traffic safety, testified that in his opinion, safe practice would have required that warning of the danger created by the projection of the traffic island be given both at the island and on the approach of Fifth Street north of the intersection. He stated that one way of doing this would have been to place an obstacle marker at the island. Additionally, to the north on Fifth Street, he also would have marked the east six feet of the pavement as a parking lane for a substantial distance north from the intersection and would have preceded this with a regulating sign telling motorists to keep to the right. He described as an alternative, having a lane line drawn on the pavement, beginning at a point substantially north of the intersection on the east edge of the Fifth Street pavement, and extending in a southerly direction on the pavement, gradually bearing west of the curb line. Such line would gradually direct traffic in the east lane to the right until the left edge of the lane was six feet west of the edge of the pavement. The line would then continue southerly, parallel to the other lane lines on Fifth Street.

Defendant does not dispute that the evidence was sufficient to support a finding of negligence upon the part of some governmental unit in the control of traffic at and approaching the intersection, nor does it deny that it was warned of the hazard existing there. The determination of whether defendant was under a duty to do the things claimed by plaintiff depends upon the operation of a complicated statutory scheme upon an equally complicated but mostly undisputed state of facts.

At the time of the accident, the intersection in question was within the corporate limits of the City of Springfield, it having been annexed in September of 1972. Prior to that time, the north edge of Stanford Avenue had been the southerly corporate limit of the city and the intersection was outside of city limits. By 1960, Fifth Street had become a part of the State highway system. That year, agreements were entered into between the State and the city to improve Fifth Street and make it a roadway 52 feet wide from Broad Place south to the north edge of the Stanford Avenue intersection. These agreements provided in part that,

> "4. Upon completion of the improvement, and so long as the street is used as a State highway, the STATE will maintain, or cause to be maintained, the pavement structure of two widths each 12 feet wide and lying one on either side of and adjacent to the center line of the pavement,"

and that,

> "10. Upon completion of the improvement, the CITY will maintain or cause to be maintained, the pavement structure outside of that

portion which is to be maintained by the STATE, together with all curbs, gutter flags, manholes, catch basins, storm sewers, utilities, and appurtenances located within the limits of the street."

The city also agreed to pay the cost of subsurfacing and paving seven-foot parking lanes on each side of the street.

The plans by which the construction of Fifth Street north of Stanford Avenue was done did not include any reference to the traffic island here in question. State plans as to construction south of the north edge of Stanford on Fifth Street included the traffic island.

In July of 1973, defendant city entered into a further agreement with the State to provide maintenance "in a manner satisfactory" to the Department of Transportation of the State for portions of certain streets which were State highways and which passed within city limits, including Fifth Street north of the north edge of Stanford. Such maintenance was "to include all necessary repairs, cleaning and snow removal."

Neil Morton, district traffic engineer for the State, testified to an informal oral agreement between the State and the city whereby the city agreed to mark the lanes upon the portions of State highways which were in the city limits.

Section 4—405 of the Illinois Highway Code (Ill. Rev. Stat. 1973, ch. 121, par. 4—405) requires the Department of Transportation of the State to "maintain all highways in the State highway system either with its own forces or pursuant to an agreement or contract entered into pursuant to this Code." Section 4—406 of the Code (Ill. Rev. Stat. 1973, ch. 121, par. 4—406) authorizes the making of contracts between the Department of Transportation and municipalities for maintenance by the municipality of any State highway or part thereof lying within the municipality. The contracts are to be terminable at the will of the Department and the maintenance is to be under the supervision of and at the expense of the Department.

Section 4—201.12 of the Code (Ill. Rev. Stat. 1973, ch. 121, par. 4—201.12) grants the Department of Transportation the power to "place, erect and maintain on highways all traffic control devices and signs authorized by this Code or by Chapter 11, Article III of 'The Illinois Vehicle Code.' " Sections 11—303(a) through (c) and 11—304 of the Illinois Vehicle Code provide for placement and maintenance of traffic control devices and state as follows:

"(a) The Department shall place and maintain such traffic-control devices, conforming to its manual and specifications on all highways *under its jurisdiction* as it shall deem necessary to indicate and to carry out the provisions of this Chapter or to regulate, warn or guide traffic.

(b) No local authority shall place or maintain any traffic-control

device upon any highway *under the jurisdiction of the Department* except by the latter's permission.

(c) The Department shall erect and maintain guide, *warning* and direction signs upon highways in cities, towns and villages of which *portions or lanes* of such highways *are under the control and jurisdiction of the Department* or for which the Department has *maintenance responsibility*." (Emphasis added.) Ill. Rev. Stat. 1973, ch. 95½, pars. 11—303(a), (b), and (c).

"Local authorities and road district highway commissioners *in their respective maintenance jurisdiction* shall place and maintain such traffic-control devices on highways *under their maintenance jurisdiction* as are required to indicate and carry out the provisions of this Chapter, and local traffic ordinances or to regulate, warn, or guide traffic." (Emphasis added.) Ill. Rev. Stat. 1973, ch. 95½, par. 11—304.

Because of defendant's different relationship to the portions of Fifth Street north of the intersection and to the intersection and Fifth Street to the south, its duty with regard to installation and maintenance of traffic control devices in the two areas must be discussed separately.

Plaintiff relies most strongly on a theory that defendant had a duty to place warning and direction signs and devices on the Fifth Street northern approach to the intersection because its maintenance jurisdiction in that area imposed a duty on it to do so under the terms of sections 11—303(c) and 11—304 of the Vehicle Code.

As has been stated, Fifth Street north of the intersection had become part of the State highway system by 1960. By the agreement of that year, the State resurfaced and widened the street, retaining full maintenance responsibility as to the center 24 feet of the street with the city agreeing to maintain the outer portions. Then, in 1973 the city agreed to maintain the entire street. However, by the terms of section 4—406 of the Highway Code, the city's maintenance was subject to Department supervision. The Department was not divested of its maintenance jurisdiction at least as to the center portion of the street.

We do not agree with plaintiff's conclusion that the combined effect of sections 11—303(c) and 11—304 was to place concurrent duties upon the Department and the city to provide signs and warnings in the area. Two witnesses, engineers for the Department and the city, testified that in their opinion, either the Department or the city could provide these devices but only upon the concurrence of the other. However, the question of where the duty lay was one of law for the court to decide.

The statutory scheme of split responsibility for giving warning envisioned by plaintiff would appear to be most unworkable and we do not think that the legislature intended to invoke it. Rather, although the

legislation is not entirely clear, we consider section 11—303(a) to impose upon the Department a duty to provide appropriate control devices on streets over which it has exclusive "jurisdiction" and section 11—304 to impose a similar duty on local authorities with regards to streets over which they have exclusive jurisdiction. Where, as here, the jurisdiction and responsibility to maintain is divided, we consider section 11—303(c) to place the duty to warn upon the Department. Had the legislature intended for the local authorities to also have a responsibility to warn where this occurs a counterpart to section 11—303(c) would logically have been added to section 11—304.

Plaintiff places importance upon the decision in *Linneen v. City of Chicago* (1941), 310 Ill. App. 274, 34 N.E.2d 100, where the city was held liable for failure to give warning of a narrow bridge owned by the Sanitary District of Chicago and by which a city street crossed a canal of that district. The action was for injuries and death resulting when an automobile ran into an abutment on the side of the bridge. The court ruled that because the city invited the public to use the bridge as a part of its highway, the city had a duty to warn although it did not own the bridge. The case is distinguished from the instant one in that there, no question was raised as to the respective responsibilities of the city and State to install warning devices on State highways running through cities.

We hold that defendant city had no duty to place warning devices upon the Fifth Street area north of Stanford Avenue. As the evidence did not indicate that the city installed or owned the traffic island nor had any "jurisdiction" over the highway south of the north line of Stanford Avenue, the city clearly had neither responsibility to remove the safety island nor to place signs or other devices in the intersection warning of the island's existence.

Because of the disposition which we make here, we need not consider the propriety of any ruling on instructions. The evidence made no showing of a state of facts that would make defendant subject to the duties asserted by plaintiff. Accordingly, we reverse.

Reversed.

MILLS and TRAPP, JJ., concur.