(No. 52058.—

CHARLES JANSSEN, Appellant, v. THE CITY OF SPRINGFIELD, Appellee.

*Opinion filed March 28, 1980.—Modified on denial of rehearing May 29, 1980.*

Brown, Hay & Stephens, of Springfield (Edward J. Cunningham, John H. Squires and Mark H. Ferguson, of counsel), for appellant.

Robert M. Rogers, Assistant Corporation Counsel, of Springfield, for appellee.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

The plaintiff, Charles Janssen, obtained a personal injury judgment for $250,000 against the defendant, the city of Springfield, in the circuit court of Sangamon County. The appellate court reversed (69 Ill. App. 3d 986), and we granted leave to appeal.

The accident which underlies this litigation occurred at about 1:30 a.m. on August 26, 1973, as the plaintiff was proceeding southward on Fifth Street in Springfield. Fifth Street is a one-way three-lane highway which gradually curves to the east at the point where it intersects Stanford Avenue, an east-west route. The middle lane is 12 feet wide, and each of the outside lanes is 20 feet wide. On the east side of the intersection is a traffic island which projects 5½ feet into the east lane of Fifth Street. The plaintiff, who was driving southward in the eastern most lane on his motorcycle, struck this projection and was thrown from his motorcycle, sustaining serious injuries. At the time of the accident no warning signs or other road markings indicated that the roadway narrowed at the intersection. The following diagram shows the intersection.

Plaintiff's complaint alleged that the city had been negligent in failing to remove the projecting portion of the traffic island, failing to warn motorists of the hazard of the intersection, and failing to adequately light the area. Evidence concerning the last allegation is not germane to this appeal because the jury, in response to a special interrogatory, found that the lighting was adequate, and the plaintiff does not now argue that this finding is against the manifest weight of the evidence. Nor does the defendant now contend that the condition of the intersection was not hazardous. The sole question is whether the city had a duty to remove the hazard or to warn of its existence. The city contends that this responsibility rested exclusively with the State of Illinois.

Evidence adduced at trial indicated that in 1958 the southern boundary of the city was the northern edge of Stanford Avenue, the intersection itself thus being outside the city limits. In that year the city and the State of Illinois entered into an agreement which, as subsequently amended, provided for the joint construction by the city and State of a 52-foot-wide pavement surface on Fifth Street from Broad Street on the north to the southern boundary of the city at Stanford Avenue. The agreement further provided that the State would pay the costs of the improvement except for preliminary design and engineering, traffic signals, 5% of the cost of an underpass below certain railroad tracks, and the outside 7 feet of pavement on each side of the road, which was to be used for parking. The city would pay these specified costs. The city and State further agreed that so long as Fifth Street was used as a State highway the State would maintain the center 24 feet of the pavement and the city would maintain the remainder. The joint construction plan did not extend beyond the northern line of Stanford Avenue and did not include the traffic island involved in this litigation. Other plans, approved and implemented exclu-

sively by the State, continued the improvement south of the city limits, and these plans did include the traffic island.

After the construction was completed the city and State each year executed a maintenance contract under which the city agreed to provide necessary repairs, and cleaning and snow removal for the center 24 feet of the highway, and the State agreed to meet the expenses. In 1972 the city annexed an area south of the north line of Stanford Avenue, including the intersection.

Various State and city officials testified concerning their understanding of the powers and duties of the city and State under the agreements. This testimony revealed an additional oral understanding that the city would maintain the lane striping north of Stanford Avenue. Other evidence indicated the absence of a lane stripe separating the parking lanes from the traffic lanes. The officials further testified that the city could initiate the placement of signs or the marking of the pavement north of Stanford but needed the approval of the State to actually make any change. Other testimony indicated that the hazard could be reduced by posting warning signs on the traffic island itself and painting its curbing yellow, by painting parking stalls on the parking lane as it approached the intersection and covering the last few stalls with "hash marks," and by posting "keep right" signs before the intersection.

A letter from a city official to a State official indicated that the city had notice of the dangers posed by the traffic island in 1964 and had requested the State to remedy it. The city did not produce any evidence of any subsequent attempts to remedy the situation. Shortly after the plaintiff's accident the State removed the projecting portion of the island. The engineer whose department removed the projection testified that he did not know of any communication with the city before the repair, but that

the immediate supervisor of the crew might have talked to city officials.

During the trial the plaintiff moved to amend his complaint to allege that the city had been negligent in failing to "cause" the projecting portion of the island to be removed, but the trial judge refused the amendment. The trial judge also refused the defendant's motions for directed verdicts at the close of the plaintiff's case and at the close of all the evidence. The theory of the motions for directed verdict had been that there was no proof that the city had jurisdiction and control over Fifth Street. The defendant also proposed special interrogatories requiring the jury to state whether it found that the city had jurisdiction and control over the intersection or over Fifth Street north of the intersection. The trial judge, however, refused to give the jury these special interrogatories. He also refused to instruct the jurors that the city had a statutory immunity from liability for failure to initially post regulatory traffic signs, but did give an instruction that the city had a statutory duty to warn motorists of dangerous conditions.

The jury returned a verdict of $250,000 in favor of the plaintiff. The defendant's post-trial motion renewed its arguments for a directed verdict. In the alternative, the motion prayed for a new trial, citing numerous errors, among them the failure to give the special interrogatories and the instruction concerning immunity for failure to initially install regulatory signs.

Before the appellate court the city argued that the trial court had erred in not granting its motions for directed verdict and for judgment notwithstanding the verdict because the evidence failed to establish that the city had jurisdiction and control over either the intersection or the approach to the intersection. Defendant also argued alternatively for a new trial, citing the trial court's failure to give the defendant's instruction con-

cerning regulatory signs. The appellate court did not reach the instructions question because it decided that the city did not have a duty either to alter the traffic island or to warn of its existence. The court concluded that the city had no duty to alter the traffic island because the island was not within the jurisdiction and control of the city. The court further concluded that the city had no duty to warn, even if it did have some jurisdiction and control over Fifth Street north of the intersection, because the court construed the relevant statutes to vest the responsibility for posting signs on Fifth Street exclusively with the State.

On appeal to this court the plaintiff argues that the city had a duty both to remove the projecting portion of the traffic island and to warn motorists of the hazard it presented. Plaintiff's argument that the city had a duty to alter the traffic island rests upon section 3—102(a) of the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1973, ch. 85, par. 3—102(a)), which provides:

> "(a) Except as otherwise provided in this Article, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used, and shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in sufficient time prior to an injury to have taken measures to remedy or protect against such condition."

Although this statute would impose a duty to alter the traffic island if the island were city property, nothing in the record indicates that the city owned Fifth Street south of the north line of Stanford Avenue. Furthermore, as the appellate court noted, nothing in the record indicates

that the city had any jurisdiction or control over Fifth Street from the intersection southward. That part of Fifth Street is a State highway. The State planned it, constructed it and maintained it. After the accident the State removed the projecting portion of the island. In the absence of any evidence to indicate that the city had any control over the traffic island, the city was entitled to a directed verdict on the allegation that it was negligent in failing to alter the island. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494.

This conclusion, however, does not necessarily absolve the city of all responsibility. A governmental unit which controls a roadway has a duty to warn motorists of hazards adjacent to the roadway even if the hazard itself is not within the control of the governmental unit. (*Mix v. City of Minneapolis* (1945), 219 Minn. 389, 18 N.W.2d 130; *cf. Birch v. Charleston Light, Heat & Power Co.* (1903), 113 Ill. App. 229; *City of Chicago v. Baker* (1901), 95 Ill. App. 413, *aff'd* (1902), 195 Ill. 54; *City of Rockford v. Russell* (1881), 9 Ill. App. 229; *City of Monmouth v. Sullivan* (1881), 8 Ill. App. 50; *Treon v. City of Hamilton* (Mo. 1963), 363 S.W.2d 704; 63 C. J. S. *Municipal Corporations* sec. 822 (1950).) In *Mix* the city of Minneapolis ceded a parcel of land to the United States for use as a naval base. A city street approached and crossed over the boundary of the base and ascended a small rise a short distance past the boundary. While the base was being constructed a contractor excavated the area just past that rise. Although the city had vacated the portion of the street within the base and did not have the authority to remedy the hazard, the Minnesota Supreme Court held that the city could be found negligent for failing to warn motorists on the portion of the street controlled by the city of the approaching hazard. Similarly, in the case at hand, a hazard existed on the roadway in an area immediately past the southern limits of the

city's possible control. If the city did control Fifth Street north of the intersection, it had an obligation to warn motorists of that hazard.

The determination whether the city of Springfield had sufficient control over Fifth Street north of the intersection to create liability depends upon the construction of a complex statutory scheme and an interpretation of the agreements between the city and the State. The Illinois Highway Code allows the State to take over a city street and make it part of the State highway system. Section 4—203 of the Code (Ill. Rev. Stat. 1973, ch. 121, par. 4—203) provides:

> "The Department may, in its discretion and as funds become available for construction and maintenance, add additional highways to the State highway system by laying out new highways or taking over highways from the county highway system, the township and district road system or the municipal street system ***. Before any such highway is taken over the Department shall notify the proper local officials in writing of its intention to do so and the date when it will assume the maintenance and care of such highway. Whenever any part or portion of any such highway which is situated within the corporate limits of any municipality is hereafter or has heretofore been taken over, the Department shall have exclusive jurisdiction and control over only that part of such highway which the Department has constructed, or which the local authority has constructed and which has been taken over by the Department, and for the maintenance of which the Department is responsible, including the hard-surfaced slab, shoulders and drainage ditches. Whenever any municipality shall construct with a durable hard surface the remaining portion of a street, a part of which has been improved with a durable hard surface by the Department, or taken over by it, then in that case the Department shall have jurisdiction and control over only that portion of the street over which it did construct the durable hard surface or that part which it took over from the municipality."

Section 4—204 of the Illinois Highway Code (Ill. Rev.

Stat. 1973, ch. 121, par. 4—204) requires the State to file a description of a highway it takes over with the Department of Transportion and also with the county clerk of each county through which the highway passes. Such a description, if it was filed, would indicate clearly the extent to which the State had taken over Fifth Street. Neither party, however, introduced those documents. Instead, the agreement between the city and State governing the construction of a concrete roadway over Fifth Street was introduced. That agreement specified that the State would maintain the center 24 feet of the road and the city would maintain the remaining 28 feet of the road surface. Subsequent annual agreements provided that the city would repair, clean and remove snow on the center 24 feet and that the State would reimburse the city for its expenses. Considering the construction agreement and the annual maintenance agreements, the jury could have reasonably concluded that the city had jurisdiction and control over the outer 28 feet of the road surface while the State had jurisdiction and control over the center 24 feet and subsequently contracted with the city for the provision of certain services on the State-controlled portion of the roadway. Such contracts are specifically authorized by section 4—406 of the Illinois Highway Code (Ill. Rev. Stat. 1973, ch. 121, par. 4—406).

The city contends, however, that even if it did have jurisdiction and control over a portion of the roadway north of Stanford Avenue, it did not have the authority to erect signs informing motorists of the approaching hazard. Section 11—303 of the Illinois Vehicle Code (Ill. Rev. Stat. 1973, ch. 95½, par. 11—303) provides:

> "(a) The Department shall place and maintain such traffic-control devices, conforming to its manual and specifications on all highways under its jurisdiction as it shall deem necessary to indicate and to carry out the

provisions of this Chapter or to regulate, warn or guide traffic.

(b) No local authority shall place or maintain any traffic-control device upon any highway under the jurisdiction of the Department except by the latter's permission.

(c) The Department shall erect and maintain guide, warning and direction signs upon highways in cities, towns and villages of which portions or lanes of such highways are under the control and jurisdiction of the Department or for which the Department has maintenance responsibility.
\*\*\*"

Section 11—304 of the Code (Ill. Rev. Stat. 1973, ch. 95½, par. 11—304) further provides:

"Local authorities and road district highway commissioners in their respective maintenance jurisdiction shall place and maintain such traffic-control devices upon highways under their maintenance jurisdiction as are required to indicate and carry out the provisions of this Chapter, and local traffic ordinances or to regulate, warn, or guide traffic. All such traffic control devices shall conform to the State Manual and Specifications and shall be justified by traffic warrants stated in the Manual. \*\*\*"

The city contends that 11—303(c) vests responsibility for erecting signs with the State and that the city could not have placed any signs on Fifth Street north of Stanford Avenue without the concurrence of the State. The city concludes that it cannot be responsibile for failing to erect warning signs because it did not have the authority to do so. We cannot agree with the premise of this argument. Section 11—303(a) requires the State to erect signs and traffic signals on highways which are entirely under State control, and section 11—303(b) prohibits local governments from erecting any signs on such highways without State approval. Section 11—303(c) similarly obliges the State to erect guide, warning and direction signs on highways over the portion or lanes of which the State has jurisdiction. Section 11—303 does not, however,

preclude local authorities from posting signs on those highways subject to mixed local and State jurisdiction. Moreover, section 11–304 of the Code (Ill. Rev. Stat. 1973, ch. 95½, par. 11–304) requires local authorities to post signs to regulate, warn and guide traffic on highways under their maintenance jurisdiction. The statute thus imposes an obligation on local authorities to warn motorists of those hazards which are incident to that portion of a highway which remains under local maintenance jurisdiction. The traffic island blocked the continuation of the outer part of Fifth Street and thus presented a hazard to motorists using a city-controlled part of the street.

Both the city and the appellate court found additional reasons for not imposing such a liability on the local authority. The appellate court reasoned that if the legislature had intended local authorities to bear responsibility for posting signs on highways subject to mixed jurisdiction it would have added language to section 11–304 explicitly creating that responsibility, as it did in regard to the State's responsibility in section 11–303(c). The appellate court further considered that a contrary construction of the statutes, casting a responsibility on both the State and the local authority, would yield a system that is unworkable in practice. The court feared that such a divided responsibility could too easily degenerate into no responsibility at all when the State and the local authority cannot agree upon what signs to place on a highway subject to joint jurisdiction. The appellate court therefore concluded that sole responsibility must be vested in one entity and that, considering section 11–303(c), the State was the appropriate repository for that responsibility. 69 Ill. App. 3d 986.

The system of responsibility envisaged by the appellate court does have certain attractions. Our task, however, is to interpret the responsibilities already created by our

legislature in existing statutes. Section 1—102 of the Illinois Highway Code (Ill. Rev. Stat. 1973, ch. 121, par. 1—102) provides in part:

"In view of the rapid growth of the State's economy and increased use of public highways, the provision of safe and efficient highway transportation is a matter of public concern. It is the declared and continuous policy of the legislature to provide for improvement of highways and the highway tranportation system as well as the preservation of investment in highways. To that end it is intended to provide for integrated and systematic planning and orderly development in accordance with actual needs. It is further declared that the provision of such a system with efficient management, operation, and control, and the elimination of congestion, accident reduction, and safety is an urgent problem and proper objective of highway legislation. *It is further declared that highway transportation system development requires the cooperation of State, county, township, and municipal highway agencies and coordination of their activities on a continuous and partnership basis and the legislature intends such cooperative relationships to accomplish this purpose."* (Emphasis added.)

We believe that this section reveals a legislative intent that the State and local authorities cooperate in the management of highways in which both have an interest. The existence of section 4—203 of the Illinois Highway Code (Ill. Rev. Stat. 1973, ch. 121, par. 4—203) (set forth above), which allows the State and the local authority to each exercise jurisdiction over a part of the same roadway, reinforces that view. Consequently, we do not agree with the appellate court that the legislature considered the exercise of authority by both the State and a local government over the same highway to be unworkable.

Nor do we believe that the absence from section 11—304 of the Illinois Vehicle Code (Ill. Rev. Stat. 1973, ch. 95½, par. 11—304) (set forth above) of specific language requiring the local government to place signs on a highway subject to divided jurisdiction implies that the

legislature intended the State to have exclusive responsibility and authority for posting signs on such highways. Our courts have long recognized that, in the absence of an act by the State which divests a local government of jurisdiction over a highway, a local government has an obligation to maintain public highways within its boundaries in a safe condition. (*Hanrahan v. City of Chicago* (1919), 289 Ill. 400; *City of Sterling v. Thomas* (1871), 60 Ill. 264; *Linneen v. City of Chicago* (1941), 310 Ill. App. 274; *Livestock National Bank v. Richardson* (1939), 303 Ill. App. 445; *Tapscott v. City of Chicago* (1939), 301 Ill. App. 322.) Section 3—102 of the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1973, ch. 85, par. 3—102) (quoted earlier herein) codifies that obligation. (*Horton v. City of Ottawa* (1976), 40 Ill. App. 3d 544.) Included therein is the duty to warn motorists of dangerous conditions (*Allen v. McCalman* (1923), 229 Ill. App. 221; *Wells v. Village of Kenilworth* (1923), 228 Ill. App. 332), which is codified in section 3—104(b) of the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1973, ch. 85, par. 3—104(b)):

> "(b) Neither a local public entity nor a public employee is liable under this Act for an injury caused by the failure to provide traffic warning signals, signs, markings or other devices unless such a signal, sign, marking or device was necessary to warn of a condition which endangered the safe movement of traffic, and which would not be reasonably apparent to or anticipated by a person in the exercise of due care."

When the State takes over a portion of a city street, the statutes impose a duty on the State to post guide, warning and direction signs on that street, but they do not vest that duty exclusively with the State. (Ill. Rev. Stat. 1973, ch. 121, pars. 11—303, 11—304.) Although the State divests the city of responsibility for that portion of the street taken over by the State, the underlying obliga-

tion of the city to warn motorists of hazardous conditions affecting the street (Ill. Rev. Stat. 1973, ch. 85, par. 3—104(b)) remains unchanged in regard to that portion of the roadway not taken over. The city maintains in its petition for rehearing that the record contains no proof that Fifth Street was a city street when the 1958 agreement was executed. However, the additional statement of facts contained in the city's brief recites that "Fifth Street *** became part of the State highway system as indicated in a construction agreement between the City and the State of Illinois adopted by Resolution on June 17, 1958 ***." That Fifth Street was previously a city street, which seems implicit in the quoted statement, is a part of the foundation underlying the city's position in this litigation from its inception. Had the fact been otherwise, it seems incredible that the issue would not have been raised at an earlier stage. *Kunde v. Prentice* (1928), 329 Ill. 82; *Marchal v. Davis* (1903), 206 Ill. 231; 5 C.J.S. *Appeal and Error* secs. 1343 to 1345 (1958).

The city also argues that the city and State engineers thought that the city could not place any signs on Fifth Street without the concurrence of the State. We have held, however, that the city does have the duty and authority to post signs warning motorists of hazardous conditions incident to that portion of the roadway still under the city's jurisdiction. That legal duty is not limited by the interpretations cast upon it by State and city employees.

The instructions given the jury in this case allowed it to find the city liable on three separate grounds: failure to adequately light the area; failure to remove the projecting portion of the traffic island; or failure to warn motorists of the hazard presented by the island. The jury returned a general verdict against the city, but also indicated in response to a special interrogatory that the lighting was adequate. We have held that the evidence

adduced at trial was not legally sufficient to enable the jury to find that the city had a duty to remove the projecting portion of the island. In certain circumstances this would entitle the city to a new trial. Section 68(4) of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 68(4)) provides:

"(4) If several grounds of recovery are pleaded in support of the same demand, whether in the same or different counts, an entire verdict rendered for that demand shall not be set aside or reversed for the reason that any ground is defective, if one or more of the grounds is sufficient to sustain the verdict; nor shall the verdict be set aside or reversed for the reason that the evidence in support of any ground is insufficient to sustain a recovery thereon, unless before the case was submitted to the jury a motion was made to withdraw that ground from the jury on account of insufficient evidence and it appears that the denial of the motion was prejudicial."

Even assuming that the city's motion for a directed verdict satisfied the motion requirement and that its post-trial motion preserved the issue, two considerations preclude granting the city a new trial based on the factual insufficiency of one of the grounds for liability submitted to the jury. First, the city has waived this ground for a new trial by failing to argue it before this court. (73 Ill. 2d Rules 341(e)(7), 341(f)); *People ex rel. Davis v. Chicago, Burlington & Quincy R.R. Co.* (1971), 48 Ill. 2d 176; *Flynn v. Vancil* (1968), 41 Ill. 2d 236.) Secondly, we do not believe the city was prejudiced. The city has not argued that the condition of the intersection was not dangerous. Furthermore, the agreement concerning the construction of the roadway clearly indicated that the city had jurisdiction and control over all but the center 24 feet of the pavement north of Stanford Avenue. The city's appeal in this case was based on legal rather than factual questions, and the city has not argued that the factual determinations necessary to create liability were against the manifest weight of the evidence.

Finally, the city argues that it is entitled to a new trial because the trial court refused to instruct the jury concerning section 3—104(a) of the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1973, ch. 85, par. 3—104(a)), which provides:

> "(a) Neither a local public entity nor a public employee is liable under this Act for an injury caused by the failure to initially provide regulatory traffic control devices, stop signs, yield right-of-way signs, speed restriction signs, distinctive roadway markings or any other traffic regulating signs."

Several of the signs that witnesses suggested the city post to warn motorists of the dangerous intersection are classified as regulatory signs in the State's "Manual of Uniform Traffic Control Devices for Streets and Highways." The city argues that it was entitled to an instruction on section 3—104(a) because the jury could have found that the proposed measures to limit the dangers of the intersection were regulatory signs and that the city was therefore immune. We do not believe, however, that the denomination of a sign as a regulatory or warning sign in the State manual determines whether a particular sign is "necessary to warn of a condition which endangered the safe movement of traffic," the standard which governs immunity under section 3—104(b) of the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1973, ch. 85, par. 3—104(b)) (set forth earlier). (*First National Bank v. City of Aurora* (1976), 41 Ill. App. 3d 326.) The jury was adequately instructed concerning that standard, and we do not believe that additional instructions concerning section 3—104(a) were necessary.

We therefore reverse the judgment of the appellate court and affirm the judgment of the circuit court.

*Appellate court reversed;*
*circuit court affirmed.*